Filed 5/2/13  In re N.P. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re N.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SACRAMENTO DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>L.D. et al.,<br><br>    Defendants and Appellants. | C072478<br><br>(Super. Ct. Nos. JD231278, JD231277) |

Mother, Heather B., appeals the termination of her parental rights to her son and daughter.[1]  Mother contends the juvenile court erred in finding the beneficial parental relationship exception to adoption did not apply.  We find no error and affirm.

---

[1]    Son's father joins in mother's appeal.

1

BACKGROUND

In 2010, mother gave birth to daughter who tested positive for amphetamines. Mother admitted to using methamphetamine, crank, uppers, diet pills and speed in the past. She also admitted using methamphetamine during her pregnancy. As part of an informal supervision agreement, mother agreed to participate in substance abuse treatment and parenting education. During the voluntary supervision period, mother tested positive for drugs and failed to attend drug treatment. In January 2011, the children were temporarily placed with their great uncle due to mother's drug use.

The Sacramento County Department of Health and Human Services (the Department) filed petitions under Welfare and Institutions Code section 300, subdivision (b),[2] alleging mother had a substance abuse problem dating back to at least 2006 from which she had not rehabilitated; mother continued to use drugs; mother used methamphetamine during the gestation of both children; and, despite her agreement to participate in informal supervision services, mother continued to use drugs and refused treatment. In April 2011, the court found the allegations true and declared the children dependents. Son, almost five, and daughter, almost nine months old, were placed together in a foster home. Reunification services and regular visitation were ordered for mother. No reunification services were offered to son's father or daughter's alleged father.

The children were engaging, social and developing well. There were some concerns about son's bedwetting and speech delays, but overall both children were developmentally on target. Son had had some problems with temper tantrums which resolved in the foster home.

---

[2] Further undesignated statutory references are to the Welfare and Institutions Code.

As of July 2011, mother completed residential treatment and moved into transitional housing. The children had weekend overnight visits with mother beginning in September 2011. Daughter was excited to see mother. Son also looked forward to seeing her, greeting her with hugs and kisses. Son separated easily, but counted down the days between visits. Although mother had made strides in her recovery, the Department was concerned about her dishonesty about where she was visiting with the children. Nonetheless, mother had a strong bond with the children and consistently maintained contact with the foster family about the children. During visits, she appeared very connected with the children. Housing was mother's primary obstacle to reunification. An additional six months of reunification services were ordered for mother, with the goal of placing the children with her once she obtained suitable housing. On October 18, 2011, mother found suitable housing and the children were placed with her with continued supervision.

The Department filed section 387 supplemental petitions on January 24, 2012. Between October 2011 and January 2012 mother repeatedly left the children with risky caretakers who had engaged in domestic violence in front of the children, despite being told not to leave the children in those circumstances and being provided with an alternate safety plan. The violence included the maternal aunt, Brandy, slicing her boyfriend, Allen, with a knife over the eyebrow and the boyfriend breaking a window out of the apartment while the children were present. Allen was on parole for drug related charges and domestic violence charges. There was also a restraining order in place against him. Mother had agreed not to leave the children with Brandy or allow any contact with Allen, but she repeatedly failed to comply with this agreement which put the children at substantial risk of harm. The children were again removed from mother. Upon being confronted about these allegations, mother adamantly denied them. She lied about Allen living in the house, lied about daughter's alleged father visiting at the house and lied about being pregnant.

3

The social worker reported mother had a bond with her children and a desire to learn to be a better parent. However, mother had little actual protective capacity as a parent and continued to allow risky people to be around the children. Mother also regularly lied and failed to follow safety plans.

The children were doing well in their foster home, although son continued to have some bedwetting problems. They had supervised visits with their mother twice a week. The children did not cry when leaving mother and son would ask when they were going home to the foster home. But, son also stated he loved his mother and missed her.

Supervised visitation continued twice a week. At one visit, daughter had an uncontrollable tantrum and mother was unable to calm her. The social worker took daughter to foster mother and foster mother was able to calm daughter immediately. Son would ask what days his visits with mom were, but otherwise did not ask about her. Both children left the visits and mother easily, although daughter was sometimes more emotional and prone to tantrums after a visit.

The Department concluded mother had failed to benefit from services, lacked insight into her situation and continued to risk her children's safety by placing them in harmful situations. Mother continued to have problems "related to codependency and dishonesty to the point of not protecting her children." There were no further services the Department could offer, so the Department recommended her services be terminated and a permanent plan of adoption ordered.

In April 2012, the court found the allegations in the section 387 petitions true. The court also found reasonable reunification services had been provided. Because it was unlikely mother would benefit from further services, the court terminated services. The matter was set for a section 366.26 hearing.

With reunification services terminated, visits were reduced from twice a week to once a week in June, then twice a month in July. Mother remained consistent with her visits. Visits were appropriate, although son tended to speak to mother as though he were

4

the parent. He gave her orders and did not heed what she told him. After visits, son had difficulty transitioning back into his routine and would take a few hours to a few days to return to his normal self. Therapy was scheduled to take place after the visits and this was helpful to son.

At the time of the section 366.26 hearing, the children had been living in a prospective adoptive home for about six weeks. The adoptions social worker, Pascale Buzbee, concluded both children were adoptable. The children were both healthy, developing well, relatively young and had shown an ability to adjust well in placements. Buzbee had found a few prospective adoptive homes which would have been a good fit for the children. Son was doing very well since being placed in the prospective adoptive home, and the stable environment it represented. Since the placement, he had not had any problems in school or any behavioral problems. He interacted comfortably with his prospective adoptive parents. Son had reported being anxious seeing his mother at his school when she would pick up his cousins. He was also anxious not knowing whether he would be returned to mother. In therapy, son also expressed anger toward mother. He liked his prospective adoptive family and appeared relieved at the prospect of being adopted. Buzbee had explained the concept of adoption to son. He appeared to understand it and was "fine with a plan of adoption."

Buzbee acknowledged mother's contact with the children had been consistent. But, daughter was not excited to visit mother nor was she upset at the end of visits. Son had a close emotional bond with his mother and would be impacted by a termination of parental rights, but Buzbee believed the benefits of a permanent and stable home would outweigh any detriment to him of terminating the parental relationship.

Mother testified at the section 366.26 hearing. She reported during visits she played and talked with the children and they were excited to see her. She estimated she had provided care for daughter for less than one-half of her life, nine months. Son seemed a little sad to leave visits but daughter would get distracted. She believed her

5

parental rights should not be terminated because the children are bonded with her and severing the parental relationship is generally not healthy for children. She acknowledged she had made mistakes but claimed she had learned from them, and had done what she could.

The juvenile court found the children were likely to be adopted. The court also found termination of parental rights would not be detrimental to the children. "Other than the mother's testimony regarding the children recognizing her as their mother and being happy to see her on visits, that she feels connected to them as her children, and that the social worker felt there is an emotional bond, which is unsubstantiated by any factual description, the Court really heard little evidence of detriment to the children of terminating parental rights." The court noted son was only four and a half years old when he was first removed from mother and, since then, mother had really been only a visitor in his life. Daughter was only six months old when she was first removed. The juvenile court ordered adoption as the permanent plan and parental rights were terminated.

DISCUSSION

Adoption must be selected as the permanent plan for adoptable children and parental rights must be terminated unless "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" due to an enumerated exception to adoption. (§ 366.26, subd. (c)(1)(B).) One such exception to termination of parental rights is if "[t]he parents have maintained regular visitation and contact with the child[ren] and the child[ren] would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); *In re Celine R*. (2003) 31 Cal.4th 45, 53.) Mother contends the trial

court erred in not finding the beneficial parental relationship exception to adoption applied.**3** We disagree.

It is mother's burden to establish the beneficial relationship exception to adoption applies. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343.) Mother satisfied the first prong of the exception in that she maintained regular visitation and contact with the children. However, she did not meet the burden of establishing that she and the children shared a beneficial parent/child relationship such that termination of that relationship would be detrimental to the children.

A beneficial relationship is one that "promotes the well-being of the child[ren] to such a degree as to outweigh the well-being the child[ren] would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The existence of a beneficial relationship is determined by considering a number of factors, including the age of the children, the amount of time the children spent in the parent's custody, the positive or negative effect of interaction between the parent and the children, and the children's particular needs. (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689.) However, neither a loving relationship (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523) nor the derivation of some benefit from continued parental contact (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466) is enough to establish this exception.

Here, the children were initially removed from mother in January 2011. Daughter was about six months old and son was four and a half years old. Over the course of 20

---

**3** There has been some disagreement in the appellate courts as to which standard of review applies in reviewing a juvenile court's determination regarding a statutory exception to adoption, abuse of discretion or substantial evidence. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1528.) Because our conclusion in the present matter would not change regardless which of these standards of review we applied, and as addressing the issue here will not assist in resolving the split of authority, we simply acknowledge the varying views and turn to the merits.

months of dependency proceedings, the children lived with mother for only three months. During those three months, they were exposed to extreme domestic violence and left with risky caretakers. Mother repeatedly failed to protect them, lied to the Department and did not avail herself of resources or established safety plans. Daughter showed little evidence of a significant bond with mother, having lived less than half of her short life with mother. Son had a bond with mother; however, he was also angry with and upset by mother. During visits he behaved toward her as if he were the parent. He issued orders and did not pay attention to her. Until beginning therapy, after visits with mother, his behavior would deteriorate and he had trouble getting back into his normal routine. Seeing mother at his school and the uncertainty of his living situation caused him anxiety. He was relieved when discussing being adopted and gaining permanence and stability. Son liked his prospective adoptive parents and his behavior improved upon moving in with them and gaining the stability of their household. Other than mother's generalized claim that severing a parental relationship is not healthy for children, mother offered no evidence that terminating parental rights would be detrimental to the children. Given all the evidence, the court did not err in finding that the beneficial relationship exception did not apply to the termination of parental rights.

DISPOSITION

The orders of the juvenile court are affirmed.


                                        NICHOLSON          , Acting P. J.

We concur:


         BUTZ        , J.


         MAURO      , J.


8