Filed 11/26/13 (note change in publication status)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Felicity S., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>ELIZABETH V.,<br><br>       Defendant and Appellant. | A137439<br><br>(Contra Costa County<br>Super. Ct. No. J1200173)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

**BY THE COURT**:

The petition for rehearing, filed on November 15, 2013, is denied.

The opinion, filed on October 31, 2013, is modified as follows:

(1)  The last sentence of the first paragraph of the introduction that begins with "In the nonpublished portion of this opinion . . ." and the entire second paragraph of the introduction are deleted.  In their place, the following sentence is substituted:

"We conclude that substantial evidence supports both orders."

(2)  Footnote 4 of the opinion that begins with "Mother filed a petition for an extraordinary writ . . ." shall now be placed immediately after the words "substantial evidence supports both orders" at the conclusion of the revised introduction.

1

(3)  Footnote 5 of the opinion that begins with "Klein was directed to address . . ." is deleted and the following new footnote 5 is substituted in its place:

"The court's concerns with the brief filed on behalf of the minor are addressed in the order to show cause re public admonition filed contemporaneously with this decision."

(4)  The last sentence of footnote 6 that begins with "We do not address . . ." is deleted.

(5)  All of Section III of the opinion entitled, "The Role of Appellate Counsel for the Minor" is deleted.

(6)  The disposition is deleted and the following is substituted in its place:

"The jurisdictional and dispositional orders are affirmed."

The revised opinion is no longer certified for publication.

These changes do not affect the judgment.

Dated:_____                              _____P.J.

2

Filed 10/31/13 (unmodified version; note change in publication status)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re FELICITY S., A Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ELIZABETH V.,<br><br>      Defendant and Appellant. | A137439<br><br>(Contra Costa County Super. Ct. No. J12-00173) |

Contra Costa County Bureau of Children and Family Services (the bureau) filed an amended petition pursuant to Welfare and Institutions Code section 300, subdivisions (b) and (c),[1] alleging, among other things, that Felicity S. was at substantial risk of harm due to the failure of Elizabeth V. (mother) to provide for the child's medical and emotional needs. Felicity had been hospitalized for uncontrolled diabetes and for attempting to commit suicide. The juvenile court sustained jurisdiction on all of the counts set forth in the petition and, at a later dispositional hearing, found by clear and convincing evidence that Felicity could not safely be returned to mother's home, and ordered reunification

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I through part II.

[1] All further unspecified code sections refer to the Welfare and Institutions Code.

1

services.  Mother appeals[2] and contends that insufficient evidence supports the jurisdictional and dispositional findings.[3]  In the nonpublished portion of this opinion we conclude that substantial evidence supports both orders.[4]

In the published portions of this opinion, which include this introduction, the background portion, part III of the discussion, and the disposition, we discuss the role of appellate counsel for the minor in situations, like the present, where the minor has not appealed and this court has exercised its discretion to grant the request of the First District Appellate Project (FDAP) to appoint counsel for the minor.  Here, appellate counsel for the minor took a position completely opposite to that taken by minor's trial counsel, did not focus on how this changed position was in the child's best interests, and did not receive any authorization from minor's guardian ad litem to change minor's position.  Under these circumstances, we hold that minor's appellate counsel exceeded her authority.

## BACKGROUND

### *The Original Petition and Recommendation of No Detention*

On February 2, 2012, the bureau filed a petition pursuant to section 300, subdivision (b), alleging that Felicity, a preteen, was at substantial risk of harm due to mother's failure to provide for the child's medical needs.  Felicity has, according to the petition, "uncontrolled diabetes and/or diabetic ketoacidosis, a life-threatening condition that occurs as a result of insulin omission."  The petition further alleged that mother had

---

[2]  Mother has filed a habeas petition, claiming ineffective trial counsel at the jurisdictional hearing (A138655).  We are filing contemporaneously with this decision a summary order denying her petition.

[3]  Felicity's father, Larry S., is not a party to this appeal.

[4]  Mother filed a petition for an extraordinary writ while this appeal was pending seeking to extend the period for reunification services from 12 to 18 months.  (§§ 366.21, (subd.) (g)(1); 361.5, subd. (a)(3); 366.22, subd. (b).)  On August 6, 2013, we filed our nonpublished decision, *In re Felicity S.,* A138940, denying mother's petition (Cal. Rules of Court, rule 8.452) from the order setting the section 366.26 hearing.  However, on the court's own motion we have extended that hearing initially from September 20, 2013, to October 20, 2013, and later to November 20, 2013.

not properly observed the child's urine test for diabetic ketoacidosis (DKA). Felicity was not detained.

The bureau filed its detention and jurisdiction report, which recommended Felicity's remaining in her mother's custody with court ordered reunification services. The report stated that Felicity was diagnosed with type 1 diabetes in February 2009. At that time, mother received full diabetes education and, subsequently, mother attended most of Felicity's medical appointments. Since her diagnosis, Felicity had four admissions to pediatric intensive care because of DKA. She was hospitalized with DKA on March 15, 2010, June 15, 2010, November 8, 2011, and January 13, 2012. Additionally, Felicity went to the hospital's emergency room on July 15, 2011, August 16, 2011, October 3, 2011, January 5, 2012, January 9, 2012, January 11, 2012, and January 18, 2012.

Amy Warner, a medical social worker, and Dr. Jennifer Olson, both from the Pediatric Endocrinology Department of Children's Hospital in Oakland (Children's Hospital), wrote a letter to the bureau indicating that DKA does not occur if insulin is given as prescribed. Ketones in the blood or urine are early signs that the body has insufficient insulin. Vomiting is a late sign of DKA and often indicates that the body has been without adequate insulin for days. The Children's Hospital recommended Felicity's "immediate removal." The report stated that Felicity's family was in denial about her care.

The bureau's report mentioned that Felicity's most recent admission for DKA to intensive care was on January 13, 2012. The cause of Felicity's DKA was, according to mother and Felicity's half sister, Sarah K., Felicity's menstrual cycle; they claimed that Felicity did not miss injections. A psychologist assessed Felicity on January 17, 2012, and recommended individual mental health therapy and family therapy to address Felicity's poor self-esteem, depression, and low confidence.

The bureau's social worker spoke to Dr. Owens, Felicity's family physician, on January 24, 2012. Dr. Owens stated that she had known mother for 15 years and mother had been doing "everything within her power to provide care for Felicity." She noted

3

that mother needed more support such as a home visiting nurse, as mother seemed overwhelmed with Felicity's medical needs. Mother worked fulltime and had to awaken every three hours during the night to check Felicity's blood sugar and to give her insulin.

A public health nurse reviewed mother's daily log of Felicity's insulin intake and blood sugar level. The nurse remarked that mother was doing what was required. Mother insisted that the doctors were not considering Felicity's menstrual cycle.

On January 26, 2012, the social worker spoke to Warner at Children's Hospital. Warner believed mother was following the diabetes instructions but was concerned that mother had not addressed Felicity's possible manipulation of her treatment. The social worker received a letter from Sarah E. Dorrell, a clinical psychologist. She had met with Felicity and mother on two occasions. She "found no evidence to support a suspicion that Felicity volitionally manipulated her blood sugar levels and no evidence to support the suspicion that [mother] was in any way negligent or inadequately supervising and parenting her daughter."

The court held a detention hearing on February 6, 2012. It found that it was not necessary to detain Felicity, and granted Larry S. (father) presumed father status.

### *The Changed Recommendation, Amended Petition, and Detention Hearing*

Esmeralda Okendo, a social worker at the bureau, prepared a memorandum dated March 13, 2013, for the court. The bureau was now recommending that Felicity be removed from mother's home "due to the child's fragile health and her emotional instability, and the mother's lack of ability to stabilize the minor's condition." This recommendation was based on events that occurred at the end of February and during the first week of March 2012.

Okendo met with Felicity at school on February 29, 2012. Felicity disclosed that she was afraid to return home because her mother threatened to hit her and told her that she did not care if the court removed her from the home. Felicity revealed that her mother was back with her boyfriend and that he was moving into the home. She asserted that her mother smoked marijuana.

4

A few days later, on March 2, Okendo received a "Suspected Child Abuse Report," dated February 22, 2012 (suspected abuse report). This suspected abuse report contained essentially the same information Felicity divulged to Okendo on February 29. Felicity, according to the suspected abuse report, commented that mother had slapped her on many occasions and kicked her once. The suspected abuse report indicated that a tearful Felicity described her mother as yelling that "she hoped Felicity would tell the court that she had been hit so she could be rid of her." Felicity also said, according to the suspected abuse report, that her mother's boyfriend had returned and was drinking alcohol every night.

On March 3, 2012, the social worker learned that Felicity was a patient in the adolescent psychiatric unit at Alta Bates Herrick Hospital (Alta Bates). Mother had failed to notify Dr. Dorrell, the family psychologist, of Felicity's hospitalization. A couple of days later, the social worker at Alta Bates confirmed that on March 1, Felicity was placed on an involuntary psychiatric hold pursuant to section 5150 after attempting suicide with an overdose of insulin. Felicity indicated that the precipitating event was a fight she had with her maternal grandmother while her mother was not home. Felicity grabbed an insulin pen and a belt, which she intended to use to strangle herself. Felicity telephoned her half sister Sarah. She then telephoned her mother and declared, " 'I'm gonna kill myself.' " Mother returned within 15 minutes of Felicity's overdose. Mother and Sarah drove Felicity to the hospital's emergency room. The following day, March 2, Felicity was transferred to Alta Bates, and was discharged on March 6.

Warner stated that insulin was like a " 'loaded gun.' " She commented that it was likely that Felicity had injected herself with 60 units of insulin, an overdose, "but not as much as Felicity believed she had injected." She noted that a large overdose could have ended Felicity's life very quickly.

The bureau filed an amended petition on March 16, 2012, to include allegations based on the recent events. The petition also asserted that mother regularly smoked marijuana while caring for Felicity and that on March 12, during an unannounced visit to

the home, personnel from Felicity's school "detected a strong odor of marijuana in the home" while Felicity was present. Felicity reported seeing her mother smoke marijuana.

On March 16, 2012, the juvenile court held a hearing on the bureau's request to detain Felicity. Mother submitted to detention. The court found that the bureau had demonstrated substantial danger to the physical health of Felicity and that reasonable efforts had been made to prevent removal. Felicity was detained. Felicity was placed in the home of a relative.

The bureau filed another amended petition on May 21, 2012, and a corrected amended petition on June 8, 2012. This petition contained allegations under section 300, subdivisions (b) and (c). Under b-1, the petition alleged that the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness: (a) "In that the child received emergency medical treatment on [four occasions] for uncontrolled diabetes and/or [DKA], a life-threatening condition that occurs as a result of insulin omission"; (b) "Mother has not properly observed the child's urine test . . ."; (c) "The child did not attend school for the month of [January]" 2012; (d) "On March 1, 2012, while in the mother's care, the child was 5150d after purposely injecting herself with an overdose of insulin"; (e) "On March 12, 2012, the child was admitted to the Contra Costa Regional Medical Center Crisis Stabilization Unit due to the child having suicidal thoughts"; and (f) "Mother regularly smokes marijuana while caring for the child."

Under b-2, the petition alleged that mother was unable to manage Felicity's emotional needs and set forth the following: (a) "On March 1, 2012, mother minimized the child's attempt to commit suicide with an overdose of insulin and did not call 911. Mother drove from Trader Joe's in Concord to her home in Martinez before driving the child to the emergency room at the Contra Costa Regional Medical Center in Martinez." (b) "On March 8, 2012, during a visit to the home mother reported to the social worker that the child was fine and denied that the child was having suicidal thoughts. On March 9, 2012, the child's therapist reported that the child continued to have suicidal thoughts from the day she was released from Alta Bates Herrick Hospital on March 6, 2012." (c)

6

"On Friday, March 9, 2012, the mother did not want to meet with the Mobile Response Team for them to assess Felicity for suicidal thoughts and to learn about the services they provide; she asked them to come on Monday or Tuesday of the following week. The mother agreed to meet with the Mobile Response Team after the social worker advised her to do so." (d) "On March 14, 2012, the mother reported to Martinez Junior High School personnel that Felicity was not suicidal and that she just wants attention."

The petition also alleged under b-3 that mother has a substance abuse problem. Under section 300, subdivision (c), the petition asserted that Felicity was suffering, or is at substantial risk of suffering, serious emotional damage and the petition described Felicity's overdose of insulin on March 1, 2012.

### *The Jurisdictional Hearing*

After a number of continuances, the jurisdictional hearing occurred on June 11 and June 20, 2012. Dr. Olson testified and all counsel stipulated that she was an expert in pediatrics and pediatric endocrinology. She first became Felicity's doctor in January 2012, and stated that Felicity was diagnosed with type 1 diabetes in 2009. She explained that ketones appear when insulin is not administered as prescribed.

Dr. Olson testified that she was concerned that Felicity was not in a safe environment. She noted that Felicity had been admitted to the hospital on four separate occasions with DKA, "which is life threatening and 100 percent preventable . . . ." She was concerned that Felicity was not receiving adequate supervision in her home. She explained that, "despite repeated counseling by the social worker, the diabetes educator, and [herself] on the need to supervise Felicity's insulin, mother has not done this, and [on several occasions] she has left Felicity in the care of adults who have not been trained in diabetes." She also recounted Felicity's intentional overdose on insulin and stated that mother did not respond appropriately to the overdose. She added that there was a delay in mother's reaching Felicity and that there was no 911 call. She stressed that mother should have called 911 immediately.

Dr. Olson maintained it was "highly abnormal for a child with type 1 diabetes" to have multiple admissions for DKA. Dr. Olson noted that her practice included about

1,000 patients with diabetes and DKA was uncommon, "especially after a patient has been diagnosed with diabetes." She testified that the normal incident rate of persons actually suffering DKA was "[a]bout 1.5 out of 100 patients per year." She observed that the treatment of DKA is problematic, as about two to five percent of the cases involve "incidents of cerebral edemas." Dr. Olson explained that a cerebral edema or the "swelling of the brain" occurs during the treatment of children with DKA. She maintained that with children, not adults, doctors "see the complications of cerebral edemas as permanent neurologic injury, brain damage and death."

To ensure that the child receives insulin and that the diabetes is managed, an adult, according to Dr. Olson, must supervise the child. Despite advising mother on multiple occasions that she was to supervise Felicity's administration of insulin, mother did not comply. She stated that mother's failure to comply caused Felicity's DKA. She explained that preteens were not "cognitively mature [enough] to understand the consequences of either not taking their medication or taking too much medication."

Dr. Olson elaborated: "[W]e expect parents to manage the diabetes with their child. So we expect that [parents will be] there when the child checks [his or her] blood sugar on the metering and that the [parents are] either administering the insulin, . . . or they are eye witnessing the child administer [his or her] own insulin, which means they see the needle go underneath the skin with each injection. And at school the school personnel are monitoring." Mother, according to Dr. Olson, left Felicity with untrained family members despite being told that she must leave her in the care of someone knowledgeable about the administration of the medication.

The court asked Dr. Olson whether a parent could determine from a blood test whether the child had been eating candies or chocolates. Dr. Olson responded that the blood test would provide that information but eating sugar or other food would not cause DKA. She emphasized, "Only insulin deficiency does." The court asked, "So the primary problem is the failure to administer the injection, not eating out of control?" Dr. Olson answered, "Correct."

8

Dr. Olson added that an unstable home environment was a known risk factor for DKA for children. She explained that these risk factors occurred in Felicity's home, as there was the use of marijuana and alcohol and unkind comments made by mother to Felicity. Dr. Olson added that she believed mother told Felicity, "[M]aybe you'll get your wish and they'll take you away from me." When the home has significant conflict, the child acts out and the parent, according to Dr. Olson, becomes unable to supervise, which leads to insulin omission and that then leads to DKA.

When asked about hormonal changes, Dr. Olson explained that "[h]ormonal changes can affect blood sugar but [do] not lead to DKA." Since being detained on March 16, 2012, Felicity had not been to the emergency room and had not been hospitalized. Felicity's overall glucose control had improved. Felicity's diabetes was judged to be controlled at her last doctor's visit on May 22, 2012.

Dr. Olson confirmed that overdosing on insulin could be fatal. She explained that the brain needs glucose and oxygen to function and insulin drives the blood sugar down. She elaborated, "So if the blood sugar gets to be so low that the brain doesn't have any access to glucose, then the patient has seizures, goes into a coma and dies."

Dr. Olson was questioned about a letter she wrote to the bureau's social worker on January 19, 2012, and it was admitted into evidence. The letter set forth the causes of DKA and emphasized that it is the most common cause of death in individuals with type 1 diabetes. Her letter stated that DKA occurs as a result of insulin omission and "does NOT occur if insulin is given as prescribed." The letter noted that "[d]uring Felicity's most recent DKA admission, the mother believed Felicity's menstrual cycle caused her DKA, despite having had education that DKA is caused by insulin omission."

In the letter, Dr. Olson advised, "The most serious concern the diabetes team has regarding Felicity's diabetes care is the family's denial that Felicity is missing insulin doses." She elaborated: "During Felicity's most recent DKA admission, her blood sugars had stabilized and they were all within an appropriate target blood sugar range. Twenty-four hours after she was discharged with an insulin plan that included slightly higher doses of insulin, the mother contacted the diabetes team to report Felicity's blood

9

sugars were elevated and she had large ketones; a clear sign of continued outpatient insulin omission. . . ."

On cross-examination, Dr. Olson stated that another doctor had been responsible for Felicity's care since January 2012. She admitted that her conclusion that Felicity's DKA was the result of mother's failure to supervise was based on Felicity's medical information and not by any comments by mother that she was not supervising Felicity's diabetes. Her conclusion that mother left Felicity with family members unknowledgeable about caring for a diabetic child was from mother's statements that Felicity had been in father's care at the time of the first DKA hospitalization and in her paternal aunt's care at the time of the second DKA hospitalization. She admitted that both father and the paternal aunt received education about diabetes care in February 2009, but both of them declined further education offered in May 2011.

Explaining the testing procedures, Dr. Olson mentioned that the blood sample indicates the blood sugar level at that moment. The dipstick urine test shows whether the body is producing ketones; this occurs only if there is an insulin deficiency. She noted that patients were instructed "to call immediately" if the dipstick revealed positive ketones. Dr. Olson expressed concern that Felicity's ketones were not always being checked. She added, "Felicity actually came to the hospital several times very, very ill, when if ketones had been checked earlier, she would not have been so sick when she finally showed up." During one admission to the hospital, Felicity had a pH balance of 7.08, and normal is 7.4. She elaborated, "That means there was so much acid in her blood that without [the] intensive care unit she would have died." She explained: "Ketones are an earlier sign than acid. So before you develop acidosis you develop ketoses. So ketones are a warning sign, and by the time you have measurable acid in the blood that's a much later sign."

Dr. Olson testified that certain situations such as illness, stress, and puberty make the body more resistant to insulin and then higher amounts must be injected. With regard to the effect of puberty, Dr. Olson explained: "During puberty a lot of growth hormone is made which leads to growth spurt, and growth hormone makes you relatively more

10

resistant to insulin, so doses during puberty need to be higher." Puberty, according to Dr. Olson, lasts two to four years. If puberty is affecting the blood sugar, a pattern would be detected and the insulin dose would be increased. She stated that the blood sugar is to be tested a minimum of four times a day: before each meal and at bedtime.

Dr. Olson testified that the Hemoglobin A1C is tested, and the test provides the average blood glucose over the previous three-month period. In February 2012, Felicity's Hemoglobin A1C was 8.6, and the norm for a person of Felicity's age with type 1 diabetes is between 8.1 and 8.3. On May 22, 2012, Felicity's Hemoglobin A1C was 8.3.

Mother also testified. She stated that Felicity, father, and she received diabetes education in February 2009. Part of the education was that Felicity should take part in her own testing as much as possible, which included giving herself injections and testing her own blood. Mother reported that she was responsible for administering Felicity's insulin but Felicity wanted to do the injections herself under mother's supervision.

Prior to March 2010, mother was calculating the dosage that Felicity needed and the amount of insulin in the syringe. Felicity physically drew the insulin into the syringe under mother's supervision. Felicity then, according to mother, physically injected herself. She usually did this under mother's supervision, but sometimes she did it under other people's supervision. She claimed that from January through March 2012, Felicity did not inject her own insulin.

Mother testified that Felicity had her first DKA episode on the first day of her first menstrual cycle. She believed that Felicity has resistance to insulin. She said her research indicated that estrogen and progesterone cause insulin resistance. She insisted that Felicity received the normal doses of insulin and that her problem was with insulin resistance, not insulin deficiency. When asked whether she had discussed this theory with Dr. Olson, she said she had. When questioned whether Dr. Olson agreed with her theory, she answered, "Not completely."

Mother was in the courtroom while Dr. Olson testified and the court asked: "Did you hear her say in court that 100 percent of type 1 cases should never have DKA if

11

insulin is properly administered?" Mother responded, "No, I did not hear her say that exactly." The court interjected, "Assume she said it, do you disagree with her?" Mother replied, "Yes."

Mother admitted that she was using marijuana. She also acknowledged that the principal of Felicity's school called her in 2011 and informed her that Felicity was cutting herself. Mother took Felicity to Dr. Grace Malonai at Alhambra Valley Counseling Associates in January 2011. After three months, Dr. Grace told mother that Felicity was a healthy child and that Felicity did not have any issues that needed to be discussed. Mother claimed that Felicity was cutting herself because of issues at school, such as the death in December of a girl she knew, and the suicide of another girl at her school.

Felicity's adult half sister, Sarah, testified. She reported that Felicity called her on March 1, 2012. Felicity was crying and said, "I need you, I need you." Sarah asked her what was wrong and then Felicity hung up the phone after about 30 seconds. Sarah went to mother's home and saw Felicity in the laundry room. Felicity had her belt around her neck. Sarah took the belt away from her. Sarah checked Felicity's blood sugar and it was "really high." Mother arrived and they took Felicity to the hospital.

The juvenile court heard closing arguments. At the end of the hearing, the juvenile court found all the allegations in the amended petition were true, and sustained the entire amended petition. The court explained that it had to evaluate the testimony of mother and Dr. Olson. If it believed Dr. Olson's testimony, mother was guilty of serious neglect. If it believed mother's testimony, Dr. Olson was mistaken in her diagnosis of type 1 diabetes, and that the diagnosis might be type 2. The court found Dr. Olson's diagnosis was "unquestionable and unimpeachable. . . . Her testimony that there is no possible other cause for DKA other than neglect in the treatment and care of this diagnosis is not just a 50/50 proposition but according to Dr. Olson it's a 100 percent conclusion." The court stated that it accepted Dr. Olson's testimony that the only explanation for DKA was the failure to administer medications and treatment according to the plan and directions. The juvenile court expressed concern about mother's testimony. Mother did not accept

12

Dr. Olson's reasoning or science and concluded that her own research on the Internet indicated that the DKA was related to hormonal changes, cramps, or both.

***The Dispositional Hearing***

On July 27, 2012, the juvenile court order stated that visits between Felicity and mother could be unsupervised. The court also continued the dispositional hearing. On this same date, Okendo received a letter from Felicity's adult brother regarding an interview he conducted with his sister. In the letter, Felicity responded that her mother was not medically neglecting her and that her mother was doing everything she could to take care of her. The letter indicated that Felicity wanted to return home.

The bureau wrote an updated memorandum dated August 9, 2012, regarding Felicity. The caregiver reported that she was not checking all of Felicity's insulin injections as scheduled and that she was "unable to provide 24-hour supervision and that Felicity need[ed] to be responsible." The caregiver had not checked Felicity's blood sugar before she departed to visit her mother on August 3, 2012, and at dinnertime, 7:20 p.m., Felicity's blood sugar reading was 83. The caregiver did not check Felicity's blood sugar after she returned that evening from her visit with mother. At bedtime, Felicity's blood sugar was high with a reading of 470. The guidelines from Children's Hospital required the person supervising Felicity to witness every insulin injection and every blood sugar check while Felicity was not in school.

On August 24, 2012, the home of Felicity's adult half sister, Sarah, was approved for the care of Felicity. After another continuance, the dispositional hearing began on August 24, 2012, and Sarah was briefly questioned and informed that Felicity's placement in her home was being finalized. Sarah stated that she agreed with her mother that DKA could be caused by factors other than the improper administration of insulin. The court responded: "So whatever the reasons may be, whether you like it or not, the court has determined in this case that DKA can only be caused by the improper administration of insulin. And that doesn't matter if you have talked to other doctors that might differ, because what the court is restricted to is the evidence that I've received in this case, and that's what the evidence that's been presented to me in this case so far has

13

been to that effect.  So it's not going to be helpful to quarrel with that. . . .  So I think what . . . the court is looking for is some acknowledgement that even though you might disagree, you're going to be approaching the entire thing of administering insulin with my ruling in mind."  Sarah responded that she accepted the court's ruling.  The court continued the dispositional hearing to October 3, 2012.

The bureau filed its dispositional report on October 22, 2012.  The bureau recommended that Felicity be declared a dependent of the court and continued her placement out of the home with family reunification services to be provided to both mother and father.

The report stated that Felicity's maternal aunt gave Okendo a copy of an article from the Internet supporting the theory that Felicity's blood sugar levels would increase when she was menstruating.  Okendo told the aunt to discuss the article with Felicity's current physician, Dr. Tariq Ahmad, at the next scheduled appointment on July 3, 2012.  On July 25, 2012, Warner, the social worker at Children's Hospital, reviewed Felicity's chart notes that Dr. Ahmad wrote on July 3, 2012.  Dr. Ahmed indicated that Felicity's blood sugars were running high; he thus increased the amount of insulin she was to receive.  Dr. Ahmad noted on Felicity's chart that he " 'reemphasized' to the aunt and Felicity that her 'menses doesn't cause DKA but may require more insulin.' "

The bureau's report stated that mother and father "clearly love Felicity" and that Felicity wanted to return to mother's home.  Okendo declared that it was not safe for Felicity to return because mother did "not accept the medical findings of the endocrinologists at Children's Hospital" that DKA is a life-threatening condition caused by the omission of insulin.  The report stated that Felicity had not required any hospitalizations for DKA since she had been removed from mother's care on March 16, 2012.

The juvenile court held the dispositional hearing on October 22, 2012.  Mother's counsel announced that mother was aware that Felicity did not want to come home at this time.  Munisha Vohra, the current social worker on the case, testified.  Vohra confirmed that Felicity preferred to stay with her sister and advised the court that mother was getting

14

married in November 2012 and might be moving to Europe. Felicity did not want to move to Europe. Vohra acknowledged that she was new to the case but expressed concerns about mother's commitment to Felicity. Vohra left a message with mother the day before the hearing to call Felicity's doctor or to give her an update on how Felicity was doing because Felicity had stated she was not feeling well and had missed a doctor's appointment. Mother told Vohra that she would call the doctor but later told the social worker that she did not call because Sarah informed her that she had already talked to the doctor. Vohra believed that mother should have called the doctor to ask whether she "needed to do anything about her child's medical condition."

Okendo, the prior social worker on the case, also testified. She stated that Felicity was placed with Sarah and that she did not believe that Felicity had suffered any DKA episodes since being placed with Sarah. She did not believe that it was safe for Felicity to return to mother's care. She recounted Felicity's numerous hospitalizations while in mother's care, mother's failure to call 911 when Felicity attempted to commit suicide, and mother's refusal to believe that Felicity's DKA was caused exclusively by inadequate insulin. She was also troubled with mother's denial of any marijuana use. She said that mother had not participated in any drug testing. She was concerned that mother's smoking of marijuana might impair her ability to monitor Felicity's blood sugar reading and to administer her medication.

Mother testified that Felicity informed her that she wanted to return to mother's home. She confirmed that she planned to get married soon and that she planned by January 2013, to move with her husband to his home in the Czech Republic. Mother stated that she had a written recommendation from a doctor for the use of marijuana.

Mother acknowledged that Dr. Olson testified that DKA was caused by insulin omission but mother believed that signified "not enough insulin." She emphasized that "insulin omission" did not mean that Felicity did not get insulin but indicated that she did not get enough. She claimed that she would follow any plan recommended by the doctors if Felicity were returned to her care.

15

Mother elaborated that she believed her daughter's hospitalizations in January 2012 were "because she had insulin resistance because of the hormones that were surging through her body." Mother added, "She also had an infection that causes insulin resistance and emotional—something was going on with her at school then and, you know, emotional stress can also cause insulin resistance." Mother reiterated that she believed menses caused insulin resistance, and claimed Dr. Ahmad told her that. When asked whether she spoke with Dr. Ahmad on July 3, 2012, about Felicity's menses and its relationship with DKA, mother said, "Yes." When questioned whether he emphasized that menses did not cause DKA, mother answered, "No, he did not." She claimed that she always properly supervised Felicity's administration of her insulin and that she did everything possible to ensure that Felicity was receiving the right amount of insulin.

At the end of the hearing, the court stated: "Well, I've carefully reviewed all of the documents that have been submitted for evidence and carefully listened to the testimony of everyone who has testified, and I am satisfied that mother does not get it. Mother has demonstrated in her testimony a rigidity of her personality and an inability to recognize what's really going on." The court found that there was evidence of marijuana abuse but no evidence of alcohol abuse, and the court modified the case plan to remove alcohol testing. The court approved the remainder of the case plan submitted by the bureau, including the drug-testing requirement. The court adjudged Felicity a dependent of the court. It also found that reasonable efforts had been made to prevent Felicity's removal from the home and that clear and convincing evidence supported the physical removal of Felicity from the home. The court ordered reunification services.

Mother filed a timely notice of appeal. Subsequently, mother filed a motion to consolidate her appeal with her petition for writ of habeas corpus. We denied that motion, but issued an order stating that these actions would be considered together. On August 22, 2013, we granted the recommendation of FDAP for appointment of counsel for the minor. This court issued an order telling the parties that this court was considering on its own motion issuing a stay of the section 366.26 hearing currently set for September 20, 2013, and instructed the parties to file any response within five days of

16

the order.  After considering the responses, this court on August 27, 2013, stayed the section 366.26 hearing set for September 20, 2013, until October 20, 2013.

On August 29, 2013, counsel for minor requested an extension of time to file her brief.  She reported to the clerk of this court that she needed more time to file the brief because she wanted to speak with Felicity.  Felicity's guardian told counsel that Felicity had been to a contested hearing and was very upset and that counsel would have to wait to speak to her when she became more stable.  We extended the time for counsel to file minor's brief by 10 days.  Counsel for the minor filed a combined brief in the appeal and in the habeas corpus action.  Minor's brief presented the same arguments urged by mother's counsel.  On September 20, 2013, counsel for mother left a message for the clerk of this court stating that mother would not be filing a response to minor's brief since minor took the same position as mother.  The bureau filed its response to the minor's brief on September 23, 2013.  On September 27, 2013, we issued an order directing counsel for minor, S. Lynne Klein, to file a declaration to address four specific concerns of this court.  Klein filed her declaration on October 7, 2013.[5]

### DISCUSSION

### I. *Jurisdictional Findings*

The juvenile court found all of the allegations in the amended petition under section 300, subdivisions (b) and (c) true.  Mother claims that sufficient evidence did not support jurisdiction on any of the grounds set forth in the petition.[6]

---

[5]  Klein was directed to address:  "(1) whether she has had any discussions or directions from the minor regarding the issues raised on her behalf in the appeal and habeas petition.  (2)  Whether she has had communications with the minor's trial counsel relating to the appeal or habeas petition.  (3)  The basis upon which minor's appellate counsel has taken a position opposite to that taken by the minor in the trial court.  (4)  Why counsel felt it necessary to submit a 75-page brief that essentially reiterates the positions and legal arguments advanced in the appellate brief filed by mother . . . ."

[6]  Minor's arguments in her 75-page brief are substantially the same as those urged by mother.  We therefore address minor's argument only in those few instances where it differs from mother's position.  We do not address any of minor's arguments that are outside the scope of mother's appeal.

17

Section 300, subdivision (b) provides that the juvenile court may adjudge a person to be a dependent child of the court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, or the willful or negligent failure of the child's parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse."[7]

The juvenile court's jurisdictional finding that a child is a dependent of the court must be supported by a preponderance of the evidence. (§ 355, subd. (a); see also *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) On review, we determine whether the juvenile court's jurisdictional finding was supported by substantial evidence. (*In re P.A.* (2006) 144 Cal.App.4th 1339, 1344.) In so doing, we "must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.) Under this standard, the juvenile court, not this court, assesses the credibility of witnesses, resolves conflicts in the evidence, and determines where the weight of the evidence lies. (*Id.* at pp. 52-53.) "We affirm the rulings of the juvenile court if there is reasonable, credible evidence of solid value to support them. [Citations.]" (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1319.) We must affirm the juvenile court's ruling if sufficient evidence supports *any* allegation under section 300. (§ 300; *D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127.)

In the present case, the petition alleged, among other things, that under section 300, subdivision (b), Felicity had suffered, or there was a substantial risk that she would suffer, serious physical harm or illness because mother was unable to manage Felicity's

---

[7] The petition also contained one allegation under section 300, subdivision (c). Section 300, subdivision (c) provides that the child is a dependent of the court if "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care. . . ."

18

medical or emotional needs. We conclude that the evidence of Felicity's uncontrolled diabetes supported a finding of jurisdiction, and the evidence of Felicity's unmanaged emotional needs also supported jurisdiction. Thus, we need not address whether specific allegations, such as Felicity's missing school and mother's substance abuse, supported jurisdiction under subdivision (b) of section 300. We also need not consider whether the record supported jurisdiction under section 300, subdivision (c).

The record amply supports the finding that mother failed to provide for Felicity's medical needs as she did not adequately supervise or monitor Felicity's testing of her blood sugar or her injections of insulin. Felicity had to receive emergency care for DKA on four separate occasions while in mother's care. Dr. Olson testified that DKA was "life threatening and 100 percent preventable . . . ." She explained that mother was not properly supervising Felicity in the home and that it was "highly abnormal" for a child with type 1 diabetes to have multiple admissions for DKA. Mother's inability to manage Felicity's diabetes threatened Felicity's life and put her at risk for a cerebral edema, which could result, according to Dr. Olson, in permanent neurologic injury, brain damage and death." Dr. Olson stated that it was mother's job to supervise Felicity because Felicity, a preteen, was not "cognitively mature [enough] to understand the consequences of either not taking [her] medication or taking too much medication." Dr. Olson unequivocally stated that "[h]ormonal changes can affect blood sugar but does not lead to DKA."

Mother argues that the record contained evidence that she did supervise Felicity's treatment and claims that Felicity's uncontrolled diabetes was a result of menses. She also claims that Felicity received all of the insulin shots prescribed. Mother cites the following evidence: Mother's own testimony that she did everything she was told to do; Dr. Owens, Felicity's family doctor, stated that she had known mother for 15 years and mother was doing "everything within her power to provide care for Felicity"; a public nurse visited the home and observed mother's daily log of Felicity's insulin intake and blood sugar level and noted that mother was doing what was required; Dr. Dorrell, a

19

clinical psychologist, met twice with mother and Felicity, and found no evidence indicating that mother was inadequately or negligently supervising Felicity.

The trial court, however, could discount the foregoing in light of Felicity's numerous hospitalizations while in mother's care, which indicated that mother was not properly monitoring her. Felicity, according to Dr. Olson, came to the hospital very sick with "so much acid in her blood that without [the] intensive care unit she would have died." If properly monitored, Felicity would never have become so ill. Dr. Olson explained that ketones are an earlier sign than acid of problems and, if Felicity's ketones had been checked earlier, she would never have developed acidosis. The dipstick urine test indicates whether the body is producing ketones and patients were instructed "to call immediately" if the dipstick revealed positive ketones. At the team decision meeting in January 2012, it was revealed that mother had not been supervising the urine stick test and Felicity had been reporting the ketones to mother. Mother insisted that it was unnecessary for her, personally, to check the ketones.

Additionally, mother testified that she brought Felicity to the hospital in March and June 2010 because of vomiting. She stated that Felicity was very ill with high blood sugars and had been vomiting continuously during the month of January 2012 before mother took her to emergency. Vomiting is a late-stage warning signal and supports a finding that mother had not adequately monitored Felicity's tests as Felicity's dosages should have been corrected prior to the stage of vomiting. Furthermore, mother's delay in addressing the problem clearly supported a finding that Felicity was not safe under mother's care.

Appellate counsel for the minor argues that the record does not show that mother was told that she was to test for ketones in Felicity's urine and she asserts that mother received inadequate medical training and education. The record simply does not support this argument. The record regarding Felicity's hospitalization for DKA on June 15, 2010, expressly states: Mother "seems to understand that patient needs to be supervised closely with blood glucose monitoring and insulin administration." The notes dated June 17, 2010, written by the nurse at Children's Hospital reported: "Family instructed that they

must always supervise all blood glucose monitoring and insulin administration with their eyes, i.e., they are not to rely on [Felicity's] word that she tested or gave insulin. *Discussed developmental issues and needs of preteens and teens to need extra supervision instead of less."* (Italics added.)

Despite being provided this specific instruction not to rely on Felicity's reports, mother told the social worker on January 30, 2012, that Felicity was reporting the ketones to her. Mother *never* claimed in the lower court that she received inadequate instruction. Rather, she specifically said, according to the social worker, that "she did not feel that it was necessary to have Felicity squat and urinate on a stick for her to check her ketones." Thus, even though Felicity had been hospitalized four times for the life-threatening condition of DKA and ketones are an important early sign of DKA, in January 2012, mother was relying on her young daughter to test and accurately report her ketones.

Mother urges this court to reject the juvenile court's findings and Dr. Olson's diagnosis based on four articles mother found on the Internet. Mother submitted these articles with her habeas petition in support of her claim of ineffective trial counsel. In her habeas petition mother maintains that her trial counsel was ineffective for failing to cross-examine Dr. Olson on her theory that menses was the cause of DKA and for failing to present her own medical expert witness in support of this theory.[8] On October 8, 2013,

---

[8] As the bureau points out, counsel for mother could not cross-examine Dr. Olson in regard to the content of these articles because there is nothing in the record to indicate this was permissible under Evidence Code section 721, subdivision (b). Evidence Code section 721, subdivision (b) provides: "If a witness testifying as an expert testifies in the form of an opinion, he or she may not be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication unless any of the following occurs: [¶] (1) The witness referred to, considered, or relied upon such publication in arriving at or forming his or her opinion. [¶] (2) The publication has been admitted in evidence. [¶] (3) The publication has been established

21

some two months after filing mother's reply brief and a month after filing her traverse in the habeas corpus matter, mother filed a declaration from a medical doctor explaining the conclusions that can be drawn from these articles.

The articles submitted do not support mother's claim that Felicity's DKA was caused by hormones. Although these articles are relevant to mother's argument in her habeas petition regarding her claim of ineffective assistance of trial counsel, they cannot be used to show that menses causes DKA. Any attempt to use them for this purpose constitutes inadmissible hearsay. Additionally, these articles, only one of which addresses adolescents, do not state that menses or hormones *cause* DKA, but note that there might be an association between menstruation and difficulty in controlling diabetes. These conclusions are not inconsistent with Dr. Olson's testimony, as she clearly acknowledged that hormonal changes impact the control of diabetes and the amount of insulin needed, because hormones can affect blood sugar.

Furthermore, the evidence in the record supported Dr. Olson's testimony (and subsequently, Dr. Ahmad's conclusion) that the cause of Felicity's DKA was not hormones, but inadequate management of Felicity's diabetes. The record establishes that Felicity did not need to go to the emergency room for uncontrolled diabetes or to be hospitalized for DKA between the time of her removal from mother's home in March 2012, to the time of the jurisdictional hearing in June 2012. If Felicity's hormones were the cause of her DKA, she would have continued to require emergency room care after being removed from mother's custody.

Mother repeatedly asserts in her brief that the evidence shows that Felicity did not miss any insulin shots. However, Dr. Sayali Ranadive, at Children's Hospital, stated in a report regarding Felicity's hospitalization on June 15, 2010, for DKA that Felicity "acknowledges having missed 'a few' insulin doses in the past 48 hours but cannot report which type of insulin." This report also revealed that Dr. Ranadive examined Felicity

as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice."

22

and "[d]iscussed briefly with [mother] and patient that DKA is a result of lack of insulin . . . ."

Dr. Olson reported that during one of Felicity's hospitalizations for DKA, the hospital was able to stabilize Felicity's blood sugars and they were, "all within an appropriate target blood sugar." However, as Dr Olson explained, "Twenty-four hours after [Felicity] was discharged [and returned to her mother's home] with an insulin plan that included slightly higher doses of insulin, the mother contacted the diabetes team to report Felicity's blood sugars were elevated and she had large ketones; a clear sign of continued outpatient insulin omission."

Additionally, the evidence was uncontradicted that it was "highly abnormal for a child with type 1 diabetes" to have *multiple* admissions for DKA. DKA is uncommon in children with type 1 diabetes. Dr. Olson testified that her medical practice included about 1,000 patients with diabetes and DKA was not common. She testified that the normal incident rate of persons actually suffering DKA was "[a]bout 1.5 out of 100 patients per year." As trial counsel for the minor argued, if mother rejects the doctors' diagnosis, "why is she going to assiduously follow the doctor's advice as [to] how you prevent the DKA from happening again."

Mother argues that after removal from mother's home, Felicity's caregivers and doctors also had trouble controlling Felicity's diabetes. The record establishes that Felicity's glucose levels were not always monitored sufficiently, and the amount of insulin she needed to receive had to be adjusted. However, as already stressed, there were no additional visits to the emergency room or instances of DKA between March and June 2012.

Not only does the record support jurisdiction based on the risk of serious physical harm because of mother's inability to manage Felicity's diabetes, the evidence in the record also supported jurisdiction under section 300, subdivision (b) based on Felicity's suffering and being at risk of serious physical harm as a result of her mother's failure to manage her emotional needs. Mother claims that her behavior was appropriate and maintains that it was not her fault that her daughter had emotional needs or was suicidal.

23

Mother cites to evidence indicating that she loved her child and was acting reasonably when dealing with Felicity's emotional problems. She asserts that allegations of emotional abuse cannot support a section 300, subdivision (b) finding, as jurisdiction under this section "requires proof that the child suffered or is at substantial risk of suffering 'serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child. . . .' " (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717.)

We agree that emotional harm, absent serious physical harm or a risk of serious physical harm, cannot be a basis of jurisdiction under section 300, subdivision (b). (*In re Daisy H., supra,* 192 Cal.App.4th at p. 718.) Here, however, the record contains substantial evidence that mother's inability to manage Felicity's emotional issues placed Felicity at risk of physical harm. The question before us is not whether the record contains some evidence not supporting jurisdiction but whether substantial evidence supported jurisdiction. Felicity attempted to commit suicide on March 1, 2012, and was institutionalized about one week later for having suicidal thoughts. When Felicity attempted to commit suicide, mother did not immediately call 911 but drove home from the store and then took her to the emergency room.

Mother and minor's counsel argue that mother acted reasonably by quickly returning home and then taking Felicity to the emergency room. We disagree; mother's behavior clearly put Felicity at risk. Mother should have immediately called 911 and considered taking her to the hospital herself only if the emergency responders had not immediately responded to the crisis. Furthermore, as trial counsel for the minor stressed, there was no evidence that mother ever attempted to telephone the maternal grandmother to ask her, "what's going on in the house where you are with the child," even though she left Felicity in the grandmother's care. The delay could have resulted in Felicity's death. Dr. Olson testified that overdosing on insulin could be fatal. Warner likened an overdose of insulin to a " 'loaded gun' " and noted that a large overdose could have ended Felicity's life very quickly. Luckily, Felicity had injected herself with only 60 units of insulin, which was not as much insulin as Felicity believed she had injected.

24

After the suicide attempt, mother told the social worker that Felicity was fine and denied Felicity was having suicidal thoughts. By denying the seriousness of Felicity's issues, mother's behavior put Felicity at risk of trying to commit suicide again. As Warner noted, Mother also initially refused to meet with the Mobile Response Team to have the team assess Felicity for suicidal thoughts.

Additionally, the record established that mother made hurtful comments to Felicity, which further jeopardized Felicity's health. The suspected abuse report dated February 22, 2012, stated that a tearful Felicity disclosed that her mother yelled that "she hoped Felicity would tell the court that she had been hit so she could be rid of her." Dr. Olson testified that mother's unkind comments to Felicity created conflict and conflict was a risk factor for insulin omission and DKA, since it increased the chances of the child's not complying with her medical regimen.

We conclude that the evidence sufficiently supports jurisdiction under section 300, subdivision (b) based on mother's failure to protect Felicity from the risk of physical harm due to her inability to manage Felicity's medical needs *and*, additionally, because of her inability to manage Felicity's emotional needs.

## II. *Dispositional Findings*

In examining mother's claim that the record does not support removing Felicity from her custody, we review the record in the light most favorable to the dependency court's order to determine whether it contains sufficient evidence from which a reasonable trier of fact could make the necessary findings by clear and convincing evidence. (See *In re Isayah C.* (2004) 118 Cal.App.4th 684, 694-695.) Section 361, subdivision (c) provides in relevant part: "A dependent child may not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . ."

25

In the present case, the record supported the juvenile court's finding that the bureau presented clear and convincing evidence that removal was necessary. In addition to the evidence presented at the jurisdictional hearing, the court considered the evidence that mother still rejected the medical professionals' determination that DKA was caused by the omission of insulin. This was despite the fact that in addition to Dr. Olson, Dr. Ahmad told the family that menses did not cause DKA, but it might require more insulin. Additionally, at the time of the dispositional hearing on October 22, 2012, Felicity had not suffered any DKA episodes since being removed from mother's home on March 16, 2012. As Christopher Judge, trial counsel for the minor told the court, "I'm just mystified why mother can't seem to do or hasn't been able to seem to do what her own adult children, Felicity's caretakers, have been able to do[, and] that is keep Felicity out of the hospital. She's not been to the hospital since the child was detained. So whatever's happening in the home that Felicity is in now, it's different than what was going on in mother's home."

The record also contained evidence that mother failed to show sufficient interest in Felicity's medical needs. Vohra testified that Felicity had missed a doctor's appointment despite Felicity's commenting to her that she did not feel well. Vohra specifically asked mother to call the doctor; mother said she would, but did not. Mother told Vohra that she spoke to Sarah and Sarah already talked to the doctor. Vohra testified that mother needed to call the doctor and mother needed to ask whether she "needed to do anything about her child's medical condition."

Mother again cites evidence that she claims showed that she acted reasonably and her own testimony claiming that she would follow Felicity's medical plan. The juvenile court, however, was entitled to accord minimal weight to mother's promises, as she was often not truthful when testifying. Thus, for example, mother testified that she spoke with Dr. Ahmand about Felicity's menses on July 3, 2012, and claimed that he did not tell her that menses did not cause DKA. This testimony was clearly contrary to the notes Dr. Ahmad had entered on Felicity's chart.

The evidence of mother's continued belief that hormones were the cause of DKA despite the diagnosis of Felicity's treating doctors that Felicity's DKA was caused by DKA omission, as well as the fact that Felicity suffered multiple DKA episodes and hospitalizations while in mother's care and *none* once removed from mother's custody through the time of the dispositional hearing in October 2012, established by clear and convincing evidence that placing Felicity back in mother's home would place her at risk of physical harm. Given mother's rigidity and refusal to believe the medical professionals' opinion, the court properly found that there was no reasonable means to protect Felicity without removing her from mother's custody.

### III. *The Role of Appellate Counsel for the Minor*

In the present case, minor did not appeal. FDAP requested appointment of appellate counsel for minor to ensure that a brief was filed that reflected minor's best interests. In such

situations, we have the discretion under section 395, subdivision (b)(1) to appoint counsel for the minor. Section 395, subdivision (b)(1) provides in relevant part: "In any appellate proceeding in which the child . . . is not an appellant, the court of appeal shall appoint separate counsel for the child if the court of appeal determines, after considering the recommendation of the trial counsel or guardian ad litem appointed for the child . . . , that appointment of counsel would benefit the child. In order to assist the court of appeal in making its determination under this subdivision, the trial counsel or guardian ad litem shall make a recommendation to the court of appeal that separate counsel be appointed in any case in which the trial counsel or guardian ad litem determines that, for the purposes of the appeal, the child's best interests cannot be protected without the appointment of separate counsel, and shall set forth the reasons why the appointment is in the child's best interests. . . ." (See also Cal. Rules of Court, rule 5.662(c).) Although we received no recommendation of the trial counsel (and are not aware that FDAP did), we concluded based upon FDAP's independent recommendation that appellate counsel should be appointed in mother's appeal to ensure that minor's interests would be protected.

After granting an extension of time to S. Lynne Klein, minor's appellate counsel, in order to permit her time to consult with minor, Klein filed a 75-page brief. The brief did not focus on explaining how the issues raised by mother's appeal impacted minor's best interests. Instead, Klein urged us to reverse the jurisdictional and dispositional orders and raised essentially the same arguments presented in mother's appellate briefs and habeas petition. The brief on behalf of minor made no attempt to justify or explain the reasons for reversing the position taken by minor's trial counsel, who was appointed as her guardian ad litem on March 16, 2012, and remains such, or the reasons why such a reversal was in minor's best interests. Klein did not provide any declaration with the filing of her brief indicating that she had spoken to minor or to minor's trial counsel or obtained the consent of minor's trial counsel as guardian ad litem to change minor's position.[9]

_____

[9] To the contrary, at oral argument, counsel for the bureau advised the court that Christopher Judge, minor's trial counsel and guardian ad litem, is "aligned with CFS." He was not asked to support minor's position on mother's appeal. Klein did not dispute that statement at oral argument. Further, in her declaration dated September 6, 2013, attached to the traverse, mother stated that she was unable to obtain Felicity's medical records because "Felicity's trial attorney has not authorized the release of any [medical]

27

Klein's failure to provide any explanation for taking a position conflicting with that taken by minor's trial counsel is highly problematic. Trial counsel for the minor has a significant role. Once a child is detained because the child can no longer safely remain in the parent's custody, an attorney is ordinarily appointed at the first court appearance to represent the child. (§ 317, subd. (c).) The attorney, who also serves as the child's guardian ad litem "has a duty to 'represent and protect the rights and best interests of the child.' [Citations.]" (*In re Josiah Z.* (2005) 36 Cal.4th 664, 681.)

Here, at the 12-month hearing in June 2012, Christopher Judge as trial counsel and guardian ad litem for Felicity, told the court: "Your Honor, I think the biggest problem here is that mother really either can't or won't understand the seriousness and the urgency of this medical situation that her daughter faces. This child has been in the hospital multiple times with DKAs . . . . Mother says she leaves the child with a trained grandmother. Grandmother is oblivious to what's going on while the child is calling the sister and apparently also the mother asking for help. And we haven't heard that the mother ever called the grandmother to say what's going on in the house where you are with the child." Judge added that mother rejected the doctor's opinion about the cause of DKA and commented that mother's refusal to believe the doctor made it unlikely that she was "going to assiduously follow the doctor's advice as [to] how you prevent the DKA from happening again."

Christopher Judge added: "I don't feel that the child would be safe returning to her. I think this mother just believes that it's one of these things that happens and take the child to the hospital, they'll take care of it, and it's not a big deal. It is a big deal. And the doctor I think she was emphatic in her concern during her testimony that—and basically saying that this should not be happening. And it's happening again and again and again and again. And I don't think—even now mother doesn't buy it. She just doesn't buy it. [¶] So I just feel that regardless of whatever the explanations have been in the past the handwriting is on the wall as far as this mother's ability to administer

---

records." Trial counsel's refusal to release Felicity's medical records to mother provides further support for the conclusion that he has not reversed his position that mother should not have custody of Felicity.

medication that this child needs and that she's just not going to be doing it. So I agree with the county counsel and submit."

At the dispositional hearing on October 22, 2012, Christopher Judge again told the trial court that he did not believe Felicity would be safe in mother's care. Judge told the court the following: "Your Honor, my position is simple. I just want Felicity to be safe. I have to agree with county counsel. There's a disconnect here between what mother says she was doing in the past, what she will do in the future if Felicity is returned to her and what has happened in the past. And mother just doesn't seem to see a relationship or her role in all the hospitalizations that Felicity had. [¶] [T]he report by Dr. Ahmad states at the very bottom in the doctor's hand [writing] that he reemphasized to mother on July 3rd that menses doesn't cause DKA, which is something that mother flatly contradicted on the witness stand today when I asked her."

Christopher Judge emphasized that Felicity would "face the same dangers in her mother's hands now that she did in the past." He added: "I'm just mystified why mother can't seem to do or hasn't been able to seem to do what her own adult children, Felicity's caretakers, have been able to do. And that is keep Felicity out of the hospital. She's not been to the hospital since the child was detained. So whatever's happening in the home that Felicity is in now, it's different than what was going on in mother's home." As the foregoing demonstrates, trial counsel for Felicity was very clear that he supported the bureau's recommendations as to finding jurisdiction over Felicity and as to removing Felicity from the home.

As discussed, on September 27, 2013, we issued an order directing Klein to file a declaration to address, among other things, the interactions she had with minor and the directions, if any, she received from minor; the communications she had with minor's trial counsel; and the basis for taking a position on appeal that reversed the position taken by minor in the trial court. Klein filed her 25-page declaration on October 7, 2013. In this declaration, Klein states in a conclusory fashion that she spoke by phone with minor's trial counsel. She does not indicate—nor did she suggest at oral argument—that she changed minor's position on appeal at the recommendation of minor's trial counsel or

29

that minor's trial counsel agreed that an alignment with mother's position on appeal was in minor's best interests.[10]

Rather than specify whether she had met with minor personally and if so under what circumstances, and what if any instructions she received from Christopher Judge, Klein's declaration focuses on raising new issues, not raised by mother's appeal, and improperly cites to postjudgment evidence. Thus, for example, Klein argues that minor's statutory and due process rights to be heard at the jurisdictional and dispositional hearings were violated and that the bureau failed to provide her with basic mental health care and supportive services. These issues are outside the scope of mother's appeal. Minor's appellate brief and Klein's declaration amount to a de facto appeal by minor but she has failed to provide this court with any authority to support this action.[11] Klein

---

[10] On the first page of her declaration, Klein states that "the basis for my taking a position opposite of that taken by the minor's counsel in the trial court include my communications with the minor, the minor's current relative caretaker (paternal grandmother), and minor's trial counsel." Klein also purports to justify reversal of the minor's position on the basis of "my experience as a registered nurse (with a current inactive license) in acute care hospital settings in psychiatry, pediatrics, and intensive care as well as in inpatient research mental health institute, research and writing a comment related to mental health issues published in U.C. Davis Law Review in 1984, and accepting an appointment from a U.S. District Court in a pro bono section 1983 civil rights prisoner's case addressing the failure to provide adequate mental health care." Klein adds that a "further basis" for her opinion that it was appropriate to change the minor's position "is my over 20 years of experience working in California appellate courts on appeals arising from juvenile dependency proceedings."

[11] We note that the court in *In re Jeremy S.* (2001) 89 Cal.App.4th 514 stated that appellate counsel for the minor, even when the minor does not appeal, might be able to raise arguments not raised in the trial court or by the parent's appeal since the court's focus is always on what is best for the child. (*Id.* at pp. 526-527.) To the extent the court

states in her declaration that this reversal of minor's position "was done consistent with the holdings of *In re Josiah Z.*[*, supra,*] 36 Cal.4th 664 and *In re Zeth S.* (2003) 31 Cal.4th 396."

Klein makes no attempt to explain how either of these cases can be read to permit her to raise new issues not framed by mother's appeal and to take a position contrary to minor's trial counsel/guardian ad litem without his consent. The Supreme Court in *In re Zeth S.* examined whether postjudgment evidence could be considered in an appeal of an order terminating parental rights after a hearing under section 366.26. After an extensive review of the well established rule that postjudgment evidence may not be presented to an appellate court, and the application of that rule to dependency cases because of the "state's strong interest in the expeditiousness and finality of juvenile dependency proceedings" the court concluded that such evidence could not be considered. (*Id.* at pp. 407, 412-414.)[12] Nothing in *In re Zeth S.* justifies Klein's unauthorized departure from minor's position in the trial court or her attempt to raise new issues.

*In re Josiah Z., supra,* 36 Cal.4th 664 acknowledged a limited exception to this rule when appellate counsel for the minor believes it is in the minor's best interests to dismiss the appeal *and* has the authorization of the guardian ad litem for the minor to do so. (*Id.* at pp. 674, 676, 681-684.) However, the Supreme Court made clear that "the limited issue involved in a motion to dismiss, whether a child should be permitted to abandon a challenge to the trial court ruling, is distinct from the broader issues resolved by the trial court, and consideration of circumscribed evidence in this context does not give rise to the vice we condemned in *Zeth S.*—an appellate court's use of new evidence

in *In re Jeremy S.* relied on postjudgmental evidence, it was disapproved by *In re Zeth S., supra,* 31 Cal.4th at pages 413-414. In any event, we are aware of no case that permits appellate counsel for the minor, in a situation where the minor has not appealed, to take a position that is completely contrary to the position taken by minor's counsel in the trial court without receiving authorization for taking such a position from the guardian ad litem and without explaining how this position is in the minor's best interests.

[12] Postjudgment evidence has been permitted to show mootness (see, e.g., *In re B.D.* (2008) 159 Cal.App.4th 1218, 1240).

31

outside the record to second-guess the trial court's resolution of issues properly committed to it by the statutory scheme." (*Id*. at p. 676.) As with *In re Zeth S.,* nothing in *In re Josiah Z.* suggests that new evidence and argument may be introduced by minor's counsel on appeal from the trial court's jurisdictional and dispositional orders. Nor can *In re Josiah Z.* be read to permit appellate counsel for the minor without the consent of the minor's guardian ad litem, to take a position contrary to that taken by minor's trial counsel.

Finally, in addition to the concerns already expressed, Klein goes to great lengths to differentiate the brief she filed from mother's briefs in this court in an attempt to justify filing a 75-page brief that agrees entirely with mother's arguments. Klein tells us in her October 5, 2013 declaration, that "I have been instructed by [FDAP] that the standard of practice of appellate counsel appointed to represent minors is to file a full brief. I have been informed that this has been the policy of FDAP for more than 15 years." Klein does not tell us whether FDAP differentiates between counsel appointed to represent the minor in an appeal to which she is a party and cases like this one in which she is not. Nor does her conclusory reference to such a policy assist the court in understanding what the policy is and why it was appropriate for her to write the lengthy brief that she filed in this case.

In sum, we conclude that when this court exercises its discretion to appoint counsel for the minor in a situation where the minor has not appealed, it is improper for the appellate counsel to reverse the position taken by minor's trial counsel without authorization by the minor's guardian ad litem[13] and/or without an explanation as to how the reversal of position is in the child's best interests. When, after careful analysis of the record and briefs of the parties, minor's counsel fully adopts the arguments of a party to

---

[13] In some cases, the minor might be capable of giving informed consent. (See, e.g., § 317, subd. (f).) Here, although the minor is over the age of 12, there has been no finding that the minor is of sufficient age and maturity to consent and there is no evidence that the minor has consented to the position taken by minor's appellate counsel.

the appeal, preparation of a full statement of the case and repetition of that party's arguments will rarely be helpful to the court or serve the best interests of the minor.

## DISPOSITION

The jurisdictional and dispositional orders are affirmed. Klein is admonished for improperly taking a position contrary to minor's position in the trial court and without direction from minor's guardian ad litem, for raising issues not encompassed either by mother's appeal or habeas petition, and for filing a brief purportedly advocating minor's best interest which essentially mirrors mother's position.

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Haerle, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Hon. Thomas Maddock |
| Attorneys for Defendant and Appellant: | |
| | Under Appointment by the Court of Appeal<br>Neale B. Gold<br>Amy Grigsby |
| Attorneys for Plaintiff and Respondent:<br>Real Party in Interest | Office of the County Counsel<br>Sharon L. Anderson<br>Jacqueline Y. Woods |
| Attorneys for Minor | Under Appointment by the Court of Appeal<br>S. Lynne Klein<br>Christopher Judge |