107 Cal.Rptr.2d 280 (2001)
89 Cal.App.4th 514
In re JEREMY S., a Person Coming Under the Juvenile Court Law.
Orange County Social Services Agency, Plaintiff and Respondent,
v.
Paul S. et al., Defendants and Appellants.
No. G027867.
Court of Appeal, Fourth District, Division Three.
May 25, 2001.
*282 Marsha Faith Levine, Irving, and Richard Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant Paul S.
Kate M. Chandler, Santa Ana, under appointment by the Court of Appeal, for Defendant and Appellant Veronica V.
Laurence M. Watson, County Counsel, and Ward Brady, Deputy County Counsel, for Plaintiff and Respondent.
Michael D. Randall, Los Angeles, under appointment by the Court of Appeal, for the Minor.

*281 OPINION
O'LEARY, J.
Paul S. and Veronica V. challenge the juvenile court's judgment terminating their *283 parental rights to their five-year-old son, Jeremy S., and freeing the minor for adoption. Earlier this year, we denied on its merits Paul's petition for writ of mandate (Paul S. v. Superior Court (June 30, 2000) G027141 [nonpub. opn.] ), seeking relief from the court's order finding there was sufficient evidence to support certain jurisdictional findings and denying reunification services.

I
Jeremy suffered severe internal injuries in January 2000 while in the care of his mother, her boyfriend, and his maternal grandmother. All of the adults disclaimed any knowledge as to how Jeremy was hurt. However, Jeremy reported to a social worker that in addition to causing his physical injuries, his mother's boyfriend played "the vacuum cleaner game" with him by placing a vacuum cleaner hose over his penis. Veronica later revealed that her boyfriend would "rough house" and "wrestle" with Jeremy on a regular basis, pinning the child on his back until he cried. She claimed to be unaware of any sexual abuse.
The petition alleged Jeremy's internal injuries were caused by blunt force trauma. He required major surgery to repair the damage and a course of three antibiotics to treat an infection. In the emergency room, Jeremy was heard to say repeatedly, "I'm sorry, I'm sorry." Veronica had to be "admonished by the ... [h]ospital [s]taff for yelling at [Jeremy] to `shut up' and 'knock it off as the child was crying while afraid and in pain...."
Jeremy was placed in a special needs foster care home because he initially required specialized help following the surgery. Moreover, Jeremy's seven-year-old "half brother, David Massey, a developmentally delayed child, was living there and had been adopted by the foster mother." Veronica's rights to David had been terminated a few years earlier in 1997. Three-year-old David had been taken into protective custody after being found alone, in the fast lane of Harbor Boulevard in Garden Grove, dressed only in a diaper.
Paul had also lost his parental rights to two other children, Jeremy's step-siblings, due to his chronic substance abuse and failure to protect them. He has used drugs since he was a teenager and has several prior drug-related arrests. Paul and Veronica were never married, but they lived together until Jeremy was a little over two years old. When Jeremy was taken into protective custody, Paul was serving time in jail for possessing a controlled substance for sale. He was due to be released in April 2000, and he told the social worker he was willing to care for Jeremy. He hoped to enter a rehabilitation program to address his drug abuse.
Veronica had monitored contacts with Jeremy before the jurisdictional hearing. At first, Jeremy was "extremely upset and was very reluctant to visit with [Veronica]." He clung to the social worker for the first 20 minutes of the first visit and told his mother, "I don't like you." Jeremy also made reference to his fear of Veronica's boyfriend. When Veronica assured Jeremy the boyfriend was no longer around, Jeremy relaxed and eventually agreed to play with her. During the next two visits, it was reported Jeremy was no longer fearful of his mother and interacted playfully. However, Veronica was unable thereafter to maintain regular weekly contact "reportedly due to her busy and somewhat unpredictable work schedule" at two different fast-food restaurants. She "expressed *284 a willingness to participate in parenting classes and counseling" but had done neither.
Paul filed an opposition to the petition, challenging the allegations contained in counts I, III and IV that he "knew or reasonably should have known" Jeremy was at risk of abuse. At the jurisdictional and dispositional hearing, he testified he did not know about the abuse because he was in jail, and a social worker gave testimony supporting Paul's story. Paul and the social worker also testified Paul was willing to care for Jeremy but unable to do so while incarcerated.
The court found all the allegations against both parents in the petition to be true. (Welf. & Inst.Code, § 300, subds. (a), (b), (d), (e) & (j)-)[1] It determined reunification services were not in Jeremy's best interest and need not be provided to either parent pursuant to section 361.5, subdivision (b)(10), and additionally not to Veronica pursuant to subdivision (b)(5). Paul challenged the ruling by filing a writ of mandate/prohibition.
In response to Paul's writ, we concluded substantial evidence supported the court's ruling. As for the jurisdictional finding, we found there was sufficient evidence supporting count II regarding Paul's inability to "supervise, protect and provide care for Jeremy." Paul did not refute this aspect of the petition, and no more was needed to uphold the judgment. Similarly, we were not persuaded by Paul's argument he was entitled to reunification services. There was ample evidence supporting the court's finding Paul had not made a reasonable effort to treat the problems that led to the removal of his other children, i.e., his inability to care for them and long-term addiction to drugs. (§ 361.5, subd. (b)(10).)
In a report prepared for the permanency hearing, the social worker reported Veronica had "established a more regular pattern of visitation." She saw Jeremy once a week for one hour. As for Jeremy, the social worker determined he was considered likely to be adopted. She said Jeremy "is an exceptionally appealing child with desirable facial features, good social skills, and an affable personality. He exhibits a good vocabulary and appears to enjoy engaging verbally."
The foster family caring for Jeremy said they desired to adopt him. The prospective adoptive mother told the social worker she has already adopted Jeremy's brother and would like the two children to be able to grow up together as the bond between them "is very evident." Additionally, the prospective parents said they "love Jeremy as their own son and believe that they can provide him with a very happy and stable home." The social worker noted, "It is still being assessed whether [the] home, designated as a group home for special needs children, is appropriate for meeting the child's needs."
The day before the scheduled permanency hearing, Paul filed a section 388 petition, seeking to modify the court's prior order denying him reunification services. In his declaration, Paul claimed he was out of jail, drug free, participating in "group therapy," and visiting with Jeremy regularly. He said he completed 52 hours of parenting classes and believed he would be able to benefit from reunification services. *285 Paul also stated Jeremy "knows me and calls me `Dad.' He greets me enthusiastically and really enjoys our time together." The court also accepted Paul's counsel's representation the group counseling was aimed at addressing his drug problem. The court denied the petition without an evidentiary hearing. The permanency hearing was continued.
In a supplemental report prepared for the hearing, a social worker, newly assigned to the case, reported she thought Jeremy was a happy and verbal child. She addressed the previous social worker's concern regarding whether the adoptive placement was a "sufficiently stimulating and enriching home environment for the child." She concluded, "[The] concerns were valid since the child with no current developmental delays resides in the home that specializes in medically or developmentally special needs children. However, after spending time with the foster mother, reviewing the child's school and home activities, observing the home environment, and interactions between the child and the family members, the undersigned found the prospective adoptive home to be more than sufficient to meet the child's medical, educational and emotional needs in a stimulating home environment.... [T]he foster/prospective adoptive parents are unconditionally committed to adopting Jeremy as a member of their family. In addition, a benefit for the child of being in his current home environment would be the development of compassion towards developmentally delayed children." The social worker described Jeremy's room as being decorated with a train and automobile theme and filled with books and age-appropriate toys. She reported the home is filled with educational books, toys, computers, children's videos, and pictures of the family, including Jeremy.
After considering testimony and argument, the court found Jeremy was likely to be adopted and terminated parental rights, finding section 366.26, subdivision (c)(1)(A) through (D) did not apply.

II
We begin with Paul's appeal.[2] He claims the court should have granted his request for hearing under section 388. We disagree. Under the statute a parent must prove changed circumstances necessitate modification of an existing order to serve the child's best interests. Although Paul was out of custody and visiting with Jeremy, there was no showing he had made a serious commitment to address his long-standing substance abuse problem which was the basis for the court's initial decision to deny reunification services. (§ 361.5, subd. (b)(10).) Paul declared only that he was attending group therapy twice a month to address his drug problem. But this was ordered as a condition of his probation. Paul failed to enroll in any sort of drug testing program, treatment program, Narcotics Anonymous, or Alcoholics Anonymous. Other than his self-serving declaration he was now "drug free," there is no evidence Paul was on the road to, much less had reached the goal of sobriety. Based on such a minimal showing of treatment, it was not unreasonable for the court to disbelieve Paul's claim and deny his request for a section 388 hearing.[3]
*286 Moreover, there was no showing additional reunification services would have been in Jeremy's best interests. There is little evidence of a father/son bond. Jeremy lived with his father and mother for the first two years of his life, during which time Paul would often use drugs in Jeremy's presence. Indeed, Jeremy's mother said she ended her relationship with Paul because of the drug abuse. Thereafter, Jeremy's visits with his father were sporadic and ended altogether while Paul was incarcerated. Paul waited one month after his release to contact social services and arrange for weekly one hour visits. As minor's counsel points out, Jeremy calls Paul his "dad," but the significance of this is tempered by the fact Jeremy called his mother's sexually and physically abusive boyfriend a similar term of endearment"papa." Given the scant evidence of a bond or of Paul's commitment to sobriety, it cannot be said the court abused its discretion.

III
We next address Veronica's contention the court should not have selected adoption as the permanent plan because she proved she maintained regular visitation and contact with Jeremy, and he would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(A).) In making this argument, she cites to the undisputed evidence she cared for Jeremy the first four years of his life, she has contributed to his educational needs during the dependency period by reading and doing puzzles with him, and she has acted in a parental role by "disciplining Jeremy as needed" during visits. She challenges the social worker's opinion Jeremy would not benefit from a relationship based on the fact he does not talk or ask about her between visits. She claims this information is unreliable because it was reported by the foster mother, not Jeremy. She cites to the fact Jeremy calls her "mommy" and is very happy during their visits. And, as she testified at the permanency hearing, she believes that, "Being his birth mother, [she] can give him more love than anybody can in this world." Veronica asserts the foster family will not be able to give Jeremy what she could give him, i.e., "unconditional love."
Although disputed by the parties, the court determined the evidence showed Veronica had maintained regular visitation with Jeremy, stating, "I believe mom does have enough visits, she's missed some visits, but does have enough to minimally comply with the first prong [of section 366.26, subd. (e)(1)(A) ]...." However, the court concluded the second prong was not proven because there was "no evidence whatsoever that this child would benefit from a continuing relationship, [¶] In fact, the evidence presented points to the opposite. Mom's limited comments [that] she is the birth mother and she can offer him unconditional love does not meet that burden. In fact, I think her acts speak louder than her minimal words ... offered to the court here today."
Indeed, the exception requires proof of a "substantial, positive emotional attachment such that the child would be greatly harmed" if deprived of the parent/child relationship. (In re Autumn H. (1994) 27 Cal.App.4th 567, 575, 32 Cal.Rptr.2d 535.) The court must balance the "strength and quality of the natural parent/child relationship in a tenuous placement against the *287 security and the sense of belonging a new family would confer." (Ibid.) As explained in In Beatrice M. (1994) 29 Cal.App.4th 1411, 1420, 35 Cal.Rptr.2d 162, the child's relationship must transcend the kind of relationship the child would enjoy with another relative or family friend.
"That showing [is] difficult to make in the situation, such as the one here, where the parents have ... [not] advanced beyond supervised visitation." (In re Casey D. (1999) 70 Cal.App.4th 38, 51, 82 Cal. Rptr.2d 426.) Although Veronica's contact with Jeremy was loving, it was not sufficient to establish the "benefit from a continuing relationship" contemplated by the exception. One can know a child's interests, enjoy playtime together, and be a loved relative, but not occupy a parental role in the child's life. And while we recognize Jeremy would benefit from such a loving relationship, the court below was justified in finding it was outweighed by Jeremy's need for a stable and permanent home that would come with adoption.
Veronica also claims the court improperly found Jeremy was adoptable because the social worker did not know the severity of his medical, developmental, and behavioral problems. We find her contentions belied by the record. To terminate parental rights and order adoption, the trial court must find by clear and convincing evidence "it is likely the child will be adopted." (§ 366.26, subd. (c)(1).) "The issue of adoptability ... focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.]" (In re Sarah M. (1994) 22 Cal.App.4th 1642, 1649, 28 Cal. Rptr.2d 82, original italics.) Our review is limited to whether the court's findings were supported by substantial evidence. (In re Jennilee T. (1992) 3 Cal.App.4th 212, 224, 4 Cal.Rptr.2d 101.)
It is undisputed five-year-old Jeremy has a seizure disorder, and some intestinal and behavioral problems due to the abuse he suffered. However, the social worker testified those conditions would not impede Jeremy's chances for adoption. She explained Jeremy was prescribed psychotropic medication to address his seizure disorder and indicated he needed no further testing for his neurological condition. Although it was too early to tell if the medicine was working, the social worker opined the disorder was not something that would make it difficult to find a person willing to adopt Jeremy. She said she had placed other children with seizure disorders in adoptive homes.
As for Jeremy's behavior problems, the social worker reported they had significantly decreased in frequency. In a report prepared in August 2000, Jeremy was described as "a behavior problem." He was prone to tantrums, slamming doors, using bad language, hitting, and scratching. In a report prepared the following month, the foster mother reported Jeremy's behavior had "improved a great deal." Indeed, at the hearing, the social worker testified that when Jeremy was first placed in foster care he was having behavioral problems two or three times a week, but now it only occurred once every two to three weeks. She described Jeremy as presently being affectionate with his foster family and siblings, being able to communicate well and describe what he wants, and being able to enjoy activities where he is helping his family. She stated, "He's just your regular five year old who likes to play with trains and watch Disney movies... ."
Veronica speculates Jeremy's behavior problems may be due to a neurological deficiency which must be evaluated before he is adopted. We find it is more likely to suspect the problems stem from the horrific abuse he suffered while in his mother's *288 care. Very telling is the fact the frequency of Jeremy's outbursts have substantially decreased within a very short period of time of living with a loving and nurturing family. We find no reason to disregard the social worker's opinion this diminishing problem will not affect Jeremy's chances of being adopted.
The record shows Jeremy is too young to tell if he is developmentally delayed. The social worker explained Jeremy is currently attending a special school for children who have lived in unstimulating environments. Although there is no way of knowing for sure, it was the social worker's hope Jeremy will be prepared to be mainstreamed into a regular kindergarten classroom setting one year from now. She believed the issue does not need to be resolved or further evaluated before Jeremy is freed for adoption.
The social worker also indicated it was too premature to determine the extent of Jeremy's medical condition. She explained it may be necessary for Jeremy to undergo further treatment if the scars caused by his abdominal surgery stretch as he grows. She said Jeremy has had "intermittent elimination problems," but they have decreased over time. She also informed the court Jeremy recently had an ear and respiratory infection and it appeared those problems had been resolved.
Despite the uncertainty of Jeremy's medical conditions, the social worker opined that even if it were determined that adoption by Jeremy's current foster family was inappropriate, he would be adopted by another family. She explained that based on her experience with adoptions, "[t]here are families that ... desir[e] a child like Jeremy [in] his age group and [having his] characteristics."
In addition to the above testimony regarding adoptability, the social worker also reported Jeremy's foster family wished to adopt him. "Usually the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family. [Citation.]" (In re Sarah M., supra, 22 Cal.App.4th at pp. 1649-1650, 28 Cal. Rptr.2d 82, italics omitted.)
Lastly, Veronica contends the social worker failed to sufficiently evaluate whether the identified adoptive family will be an appropriate placement. However, this is not a relevant consideration. Only when a "social worker opines that the minor is likely to be adopted based solely on the existence of a prospective adoptive parent who is willing to adopt the minor, [may] an inquiry ... be made into whether there is any legal impediment to adoption by that parent...." (In re Sarah M., supra, 22 Cal.App.4th at p. 1650, 28 Cal. Rptr.2d 82, italics added.) Here, the social worker concluded Jeremy was adoptable not only because a family wanted to adopt him, but also because he "is an exceptionally appealing child with desirable facial features, good social skills and an affable personality."
And, in any event, we find the prospective adoptive home was sufficiently evaluated so as to allow the trial court to consider it when assessing Jeremy's adoptability. Initially, a social worker questioned whether a special needs home for developmentally challenged children would be a proper placement. She simply noted more investigation was needed. A second social worker did this: She visited the *289 home, watched Jeremy interact with the family, and spoke at length with the foster mother. As described in detail above, the social worker concluded the home was "more than sufficient to meet the child's medical, educational and emotional needs...."
Veronica faults the social workers for not ascertaining the nature and to what extent the other five children in the family are disabled. She questions how much attention Jeremy will receive in such an environment, especially if his medical problems "escalate." But, as aptly stated by county counsel, "This kind of speculation has no place in the appellate arena." There is no evidence Jeremy will not get the care and attention he needs and deserves. To the contrary, the social worker reported the prospective parents expressed they "would like to adopt Jeremy because they love having him as part of their family. The prospective adoptive mother has known him since he was one year old and feels that she has already formed a very strong bond with him. The prospective adoptive father has been caring for Jeremy since his placement with the family, and feels very attached as well. The prospective adoptive mother has already adopted Jeremy's brother and would like the two children to be able to grow up together.... The prospective adoptive parents love Jeremy as their own son and believe that they can provide him with a very happy and stable home. They would really like to make him a permanent member of their family." The social worker also stated the family "give[s] Jeremy their constant attention and always ensure[s] that he knows that they love him and that he is safe in their home."

IV
Turning now to Jeremy's argument that he was not adoptable, as a matter of law, by virtue of section 366.26 subdivision (c)(1)(C), we have several concerns. We start with the obvious procedural one. Jeremy is not an appellant, and he is raising a new argument for the first time on appeal. Ordinarily, this court cannot review error against a nonappealing party, much less matters which were not presented in the lower court. (9 Witkin, Cal. Procedure, supra, Appeal, §§ 323, 328, pp. 361, 369.) However, juvenile cases are hardly ordinary. Although one or both parents are usually the appellant, the court's focus is always on what is best for the child. And, for obvious reasons, the respondent, the minor, is not a typical prevailing party in the legal proceedings. In most dependency cases the minor simply gains the right to hope to be adopted by a family who will love, care, and nurture him.
We also recognize, "Many dependency cases have held that a parent's failure to object or raise certain issues in the juvenile court prevents the parent from presenting the issue to the appellate court. [Citations.]" In re Lorenzo C. (1997) 54 Cal.App.4th 1330, 1338, 63 Cal.Rptr.2d 562.) Those courts have reasoned that "the parent bears the responsibility to care for his or her own interests by asking the court to exercise its discretion in a manner favorable to the parent. In such circumstances, the courts have not permitted the silent parent to argue that the juvenile court erred in not being psychic." (Id. at p. 1339, 63 Cal.Rptr.2d 562.)
We have a very different scenario here: It is the child raising an issue his trial counsel failed to raise below and his appellate counsel determined it was appropriate to include in the respondent's brief rather than file a notice of appeal. Because the paramount concern of the appellate court in all dependency proceedings is for the protection and welfare of the child, we find it would be inappropriate to *290 simply ignore the issue raised by Jeremy as waived based on procedural technicalities. Rather than debate the issue as to whether Jeremy was afforded effective assistance of counsel, we find it appropriate under the circumstances to exercise our discretion and dispose of the issue directly. (See 9 Witkin, Cal. Procedure, supra, Appeal, §§ 325, 398, pp. 365, 450-451.) The parties have supplied supplemental briefing.[4]
Jeremy's counsel contends the court "should not have freed Jeremy for adoption into a business setting." He relies on section 366.26, subdivision (c)(1)(C), which allows a court to select a permanent plan, other than the legislatively preferred plan of adoption, if it is proven termination of parental rights will be detrimental to the child because "[t]he child is placed in a residential treatment facility, adoption is unlikely or undesirable, and continuation of parental rights will not prevent finding the child a permanent family placement if the parents cannot resume custody when residential care is no longer needed." He interprets the statute to mean the proprietors of special needs homes should not be allowed to adopt a child lacking special needs. County counsel disagrees, maintaining the statute was passed due to the Legislature's concern "about children who might be in residential treatment facilities where the primary goal was treatment and where, when treatment was complete, the placement would no longer be available." We found no case authority interpreting the statute and turned to the legislative history.
"The touchstone of statutory interpretation is the probable intent of the Legislature. When interpreting a statute, we must ascertain legislative intent so as to effectuate the purpose of a particular law. Of course our first step in determining that intent is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citation.] When the words are clear and unambiguous, there is no need for statutory construction or resort to other indicia of legislative intent, such as legislative history. [Citation.] But language that appears unambiguous on its face may be shown to have a latent ambiguity; if so, a court may turn to customary rules of statutory construction or legislative history for guidance. [Citation.]" (Quarterman v. Kefauver (1997) 55 Cal.App.4th 1366, 1371, 64 Cal.Rptr.2d 741.) Such is the case here.
In 1986, Senate Bill No. 1195 was enacted, in part, to reorganize and revise dependency law and restructure a number of statutes to provide for an effectively structured approach to governmental intervention within families when allegations of abuse were made. (Sen. Bill No. 1195 (1985-1986 Reg. Sess.).) Additionally, a task force was established under the bill to address the conditions under which children could be removed from their homes. (Ibid.)
One product of the work of this task force was the enactment in 1987 of Senate Bill No. 243, which, among other things, established a new, somewhat accelerated procedure, for terminating parental rights. (Sen. Select Com. on Children and Youth, Rep. on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (Jan.1988) p. 10; Sen. Bill No. 243 (1987-1988 Reg. Sess.)) Although clearly intent on streamlining and expediting the procedures for termination of parental rights, the Legislature *291 recognized the need to create certain exceptions to the statutory preference for adoption. Among the exceptions included in the new section 366.26 was the "residential facility exception" provided for in section 366.26, subdivision (c)(1)(C).
The Senate Bill No. 1195 task force concluded that when a child is in a residential treatment facility, termination of parental rights generally is not needed to ensure a stable placement for the child. (Sen. Select Com. on Children and Youth, Rep. on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (Jan.1988) p. 11.) It reasoned, moreover, that terminating parental rights might result in leaving a child without any parents if another permanent home cannot be found when he or she is able to leave the residential treatment facility. (Ibid.)
In applying this analysis to our facts, we conclude the exception is inapt. Jeremy was placed in a special needs home primarily because his disabled older brother lives there and the boys share a strong bond. There is no evidence that Jeremy currently requires the professional services available at the home and, as such, is "able to leave the residential treatment facility" now. Likewise there is no evidence to suggest Jeremy would be "leaving the home without any parents." The evidence is quite the contrary. Jeremy has prospective parents who are ready and willing to adopt him. Nothing in the statute or its legislative history suggests the Legislature had any intent to declare those who, by occupation or vocation, choose to operate a residential facility ineligible as adoptive parents.[5]
While minor's counsel contends the court "should not have freed Jeremy for adoption into a business setting," more accurately the court's action allows Jeremy the freedom to transition from a resident at the special needs facility to a member of a loving family without ever having to make an adjustment to a new physical surrounding.
The judgment is affirmed.
SILLS, P.J., and BEDSWORTH, J., concur.
NOTES
[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] We note Veronica joins in the arguments Paul raised on appeal.
[3] Paul spends a great deal of effort arguing the court was confused as to why reunification services were initially denied. He asserts the court did not realize he was denied services pursuant to section 361.5, subdivision (b)(10), but rather it believed Paul played a role in the abuse Jeremy suffered and was denied services pursuant to subdivision (b)(5). We need not debate this issue however, because we find Paul failed to show a change of circumstances regarding his substance abuse, which was the basis of the subdivision (b)(10) finding. "If the decision of the lower court is right, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the court reached its conclusion." (9 Witkin Cal. Procedure (4th ed. 1997) Appeal § 340, p. 382, original italics.)
[4] We granted county counsel's request to file a supplemental brief. Jeremy's counsel filed a reply to the supplemental brief. The parents filed letter briefs: Paul stated he takes "no position with respect to the assertions made by Jeremy's appellate counsel." Veronica's untimely letter asserts she wishes to join Jeremy in raising those arguments.
[5] Accordingly, we need not address the parties' arguments on whether the prospective adoptive home was a "residential treatment facility" under the exception.