Filed 8/26/14  In re Faith R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| In re FAITH R., a Person Coming Under the Juvenile Court Law. | C075638 |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. 11JVSQ2896501) |
| Plaintiff and Respondent, | |
| v. | |
| J. R., | |
| Defendant and Appellant. | |

Father appeals the juvenile court's order terminating his parental rights to his daughter, the minor Faith R.  He contends there is not substantial evidence to support the finding that she was likely to be adopted.  We affirm.

1

BACKGROUND

In July 2011, the Shasta County Health and Human Services Agency (the Agency) placed the then two-year-old minor and her then five-year-old half brother into protective custody after their parents got into a fight and were arrested for public intoxication. The children had been left at home alone, and when they were placed into custody, 16 marijuana plants were observed in the home within their reach. Both parents tested positive for THC and cocaine the next day. Mother also admitted to past and current mutual domestic violence between herself and father. The Agency filed a petition under Welfare and Institutions Code[1] section 300. The juvenile court found the allegations of the petition true and declared the children dependents.

The children remained in a foster home from July 26, 2011, to July 3, 2012, when a trial home visit began with mother. Initially, the children needed constant supervision in the foster home, but by April 2012, they had adjusted well, and had "come a long way in regards to their behavior. At the beginning of their placement the children ran around out of control and would not listen. [Brother] would scavenge for food throughout the house and needed fulltime supervision. The children have calmed down." The social worker and the foster mother believed the minor was trying to mimic brother's behavior. The children had no significant health problems or diagnosed mental health needs.

In July 2012, the children were placed with mother in a trial home visit. The September 2012 status report noted the minor was a happy little girl who was a pleasure to be around. She had no diagnosed mental health needs and her behavior did not present significant problems at school or in the home. Shortly after that report, the Agency ended the trial home visit because mother relapsed by using methamphetamine and allowing father to live in the home without the social worker's knowledge or permission. Mother

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

reported father was "acting abusive" and she suspected he was using methamphetamine again. The minor and her brother returned to their initial foster home. However, because father was making threats toward the foster parents, and the social worker was concerned for the safety of the children and the foster parents, the minor had to move in December 2012. The children were doing well in their new placement and had made a smooth transition.

In October 2012, the minor disclosed that while back in her mother's home, her brother had "touched her down there" and put his toe in her genitals. Father visited with the children on February 11, 2013. During this visit, father gave the children each a vibrating Hexbug toy. They both placed the toy on their groins, but immediately removed them. After the visit, the children began acting out sexually. Because of these behaviors, the Agency had to move the children again.

By September 2013, the Agency reported both children were doing well in their placement. They were both working with therapists to address challenging behavioral issues. Both children were exhibiting sexualized behaviors with each other and other children. As a safety measure, the children slept separately and did not change in the same room. The children continued to have no significant health problems.

A couple of days later, the Agency filed an addendum report. This report noted brother engaged in sexualized and violent conduct with the minor and exhibited other challenging behaviors at home and in school. The minor was doing well in her placement and was enjoying preschool. She was very social and enjoyed playing with other children. She did exhibit some sexualized behaviors, such as wanting to draw genitals on pictures, observing herself nude in the mirror, and open-mouth kissing her dolls. She was seeing a counselor to address these issues and she was also working on personal space and boundaries, and regulation and direction compliance. The placement was a

concurrent placement and the foster parents were utilizing Triple P[2] skills to work with both children. Father moved to Nebraska in March 2013 and did not request further visits with the minor.

The children were placed in separate foster homes in December 2013.  The prior foster home had given a seven-day notice on the children.  The seven-day notice coincided with two community care licensing complaints on their home, one for possibly spanking the minor and other foster children in the home, and the other for failing to provide appropriate supervision of the minor and brother.  The foster parents also reduced the minor's therapy sessions without the approval of the social worker or the therapist. Despite all of these challenges, the minor had done well in the placement.

Because of the sexualized behavior between the children and the high level of supervision they required as a result of that behavior, the Agency was not able to locate a home for them together.  The minor continued to do well in her new foster home.  She was diagnosed with adjustment disorder with mixed disturbance of emotion.  When she did not receive one-on-one attention, she engaged in negative attention seeking behaviors, including climbing onto the caregiver, asking for snacks, fighting over toys and space, acting like an animal, and licking people and things.  The social worker described these as "mild behavioral issues."  Overall, the minor's health was excellent, with no significant health problems.  She was developmentally on target.  She had excellent fine and gross motor skills and speech and language skills.  She knew several colors and could count.  She liked Hello Kitty, dolls, and loved animals.  She was described as energetic and her behavior could be challenging, with daily tantrums and nightmares about once a week.  She had difficulty understanding the nightmares were not

---

**2**      Triple P is a positive parenting program that gives parents simple and practical strategies to help them confidently manage their children's behavior, prevent problems developing, and build strong, healthy relationships.

4

real.  She was afraid of the dark and required a night-light and her special blanket to sleep.  She did well on a consistent daily routine.

The Agency indicated there were many possible available adoptive homes for the minor and her behavioral challenges would not be a barrier to adoption as there were families with the necessary skills and desire to parent her.  The Agency had identified 18 available families with approved home studies who wanted to adopt a child with characteristics similar to the minor's.  Accordingly, the Agency concluded it was highly likely the minor would be adopted.

The juvenile court found the minor likely to be adopted and terminated parental rights.

DISCUSSION

Father contends there was not substantial evidence to support the finding the minor was likely to be adopted.

We review a finding of adoptability only to determine whether there is evidence, contested or uncontested, from which a reasonable court could reach the conclusion the child is likely to be adopted within a reasonable time.  It is irrelevant that there may be evidence which would support a contrary conclusion.  (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)  We review the record in the light most favorable to the juvenile court's findings, and draw all inferences from the evidence that support the court's determination.  (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1177.)

"The adoptability issue at a section 366.26 hearing focuses on the dependent child, e.g., whether his or her age, physical condition, and emotional state make it difficult to find a person willing to adopt.  [Citation.]  It is not necessary that the child already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.'  [Citation.]  [¶]  Conversely, the existence of a prospective adoptive parent, who has expressed interest in adopting a dependent child, constitutes evidence that the child's age, physical condition, mental state, and other relevant factors are not likely to dissuade

individuals from adopting the child.  In other words, a prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family." (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1311.)

Father relies on *In re Amelia S*. (1991) 229 Cal.App.3d 1060, 1065-1066, which he represents as holding:  "That a few foster parents were considering adopting is a far cry from the clear and convincing evidence required to establish the *likelihood* of adoption." *Amelia S.* is distinguishable.  In *Amelia S*., the minor was one of 10 children, ranging in age from a newborn to nine, who were all taken into protective custody.  (*Amelia S., at p.* 1062.)  Each permanency hearing dealt with five of the children.  (*Ibid*.)  The permanency reports indicated that the sibling set to which the minor belonged would all be placed together.  (*Id*. at p. 1063.)  The report stated that "[r]ecruitment for prospective adoptive families ha[d] been initiated and several possible families ha[d] already been identified," but did not state that any had expressed willingness to adopt.  (*Ibid*.)  A petition for modification filed by the adoption assessment agency asserted:  " 'The minor is a special needs child in that the minor is part of a sibling set of ten.  The minor suffers from social delays as well.  Due to the above circumstances, [the Agency] considers the minor a hard to place child.' "  (*Ibid*.)  The reviewing court found, under the circumstances, that the fact "a few foster parents were *considering* adoption" was "a far cry . . . from the clear and convincing evidence required to establish the *likelihood* of adoption."  (*Id*. at p. 1065.)  In the present case, unlike *Amelia S*., there is no evidence that anyone has ever identified the minor as a " 'special needs child' " or a " 'hard to place child,' " nor is she part of a large sibling group.  To the contrary, here the social worker characterized the minor's behavioral problems as "mild" and concluded she was highly likely to be adopted.

Having reviewed the record, we conclude there was substantial evidence to support the juvenile court's adoptability finding.  The minor is only four years old.  She is

6

physically healthy and developmentally on track. Her motor and language skills are excellent. Although she has been in multiple placements, the record reflects that changes in placement were not due to her behavior. She is a happy little girl, who is a pleasure to be around. She has exhibited some sexualized behavior. The record indicates this behavior began after, and was exacerbated by, visits with her father and time with her brother. There have been indications she mimics her brother's behavior. Since being placed separately from her brother, the reports do not indicate any further sexualized behavior. She has a diagnosed adjustment disorder, engages in negative attention seeking behavior, has tantrums and nightmares, is afraid of the dark, and needs a night-light and special blanket. So do many four-year-old children. There are 18 homes with completed home studies interested in adopting children with the minor's characteristics. This is sufficient evidence that minor is adoptable. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1525-1527; *In re Jeremy S*. (2001) 89 Cal.App.4th 514, 523-525, disapproved on other grounds in *In re Zeth S*. (2003) 31 Cal.4th 396, 413-414.)

## DISPOSITION

The orders of the juvenile court terminating father's parental rights are affirmed.


        ROBIE        , Acting P. J.


We concur:


        BUTZ        , J.


        MURRAY        , J.