Filed 1/14/15 In re I.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re I.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. R.S., Defendant and Appellant. | E061563 (Super.Ct.No. J231568) OPINION |

APPEAL from the Superior Court of San Bernardino County. Lily L. Sinfield, Judge. Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Regina A. Coleman, Principal Assistant County Counsel, and Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

1

# I

## INTRODUCTION

Regina S., mother, appeals from an order terminating parental rights. (Welf. & Inst. Code, § 395.1.)[1] Mother argues there was insufficient evidence that her son I.M. was adoptable or that he should be moved from his current institutional placement to a prospective adoptive home. (§ 366.26, subd. (c).)

I.M. is now 13 years old. When he was born in June 2001, he tested positive for methamphetamine. He is nonverbal and nonambulatory with profound mental retardation, quadriplegia, cerebral palsy, and other conditions. He requires a gastric feeding tube, a catheter, an oxygen machine, and a breathing monitor. He has been the subject of the current dependency since December 2009 when he nearly died while in the care of his legal guardian, his maternal grandmother (MGM).

In a report prepared by the Inland Regional Center (IRC) in December 2013, I.M. was described as severely disabled and entirely dependent on his caregiver for all his life activities. He was living in a facility for the medically fragile. A married couple, who have many years of experience caring for children with special needs, wants to adopt him.

In June 2014, the court terminated parental rights so that I.M. could be adopted. Substantial evidence supports the finding of adoptability and no exception applies under section 366.26, subdivision (c)(1)(B)(iii). We affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

II

FACTUAL AND PROCEDURAL HISTORY

*A.  December 2009—December 2013*

We briefly summarize the pertinent information for the first four years of this case.

Mother and father had four children together, I.M., M.M., and two others.  The parents had received dependency services in 2001, 2002, and 2006 but ultimately M.M. was placed with paternal relatives and I.M. was placed with the MGM.  In 2008, the parents' reunification services were terminated.

In December 2009, I.M. was hospitalized.  He was malnourished, dehydrated, suffering from a severe dental infection, and reportedly near death.  He weighed only 31 pounds.  The MGM had been treating him with Pedialyte and Tylenol.  CFS[2] inspected the MGM's home and found it uninhabitable.  It was extremely cluttered and infested with bugs.  Many animals—eleven cats, six dogs, and two birds—were living there.  The MGM seemed incapacitated and her behavior was erratic.  She was very reluctant to let I.M. be placed in a facility where he could be treated and she resisted receiving special needs training in how to care for him properly.

CFS filed the original dependency petition in March 2010, alleging failure to protect by parents and the MGM.  (§ 300, subd. (b).)  Both parents were also charged with abuse of sibling (M.M.) due to their substance abuse.  (§ 300, subd. (j).)  The parents had prior substantiated referrals for general neglect in 2001 and 2006.  After the juvenile

---

[2] Children and Family Services, Human Services, County of San Bernardino.

court found a prima facie case for dependency jurisdiction, it detained I.M. out of the home.

In July 2010, the juvenile court ordered the MGM's legal guardianship terminated because of her mental health and substance abuse issues. The juvenile court also ordered no reunification services for the parents. (§ 361.5, subd. (B)(10).)

In 2010 and 2011, I.M. continued to have difficulties with eating, such as gagging and screaming, and frequent emergency room visits. Complications with the feeding tube included infection, damage to the esophagus from stomach acid and aspiration in his lungs, leading to pneumonia. I.M. took three to four medications daily and experienced seizures. He had poor motor skills. Although I.M. was nonverbal, he smiled, frowned, laughed, cried, and made loud vocal sounds but he did not respond to his name. He seemed to enjoy being held, gently massaged, and spoken to in a friendly manner. He was enrolled in a special day class and would fall asleep throughout the day. When classmates spoke, he would occasionally look in their direction. His goals were to allow his teeth to be brushed daily and to follow an object with his eyes. I.M. seemed to enjoy visits with the MGM.

In 2011, mother began visiting I.M. Mother behaved appropriately during visits. In March 2011, mother committed a residential burglary. (Pen. Code, § 459.) In July 2011, mother's two younger children were removed from her care and she was offered reunification services. Eventually, she was convicted of committing willful cruelty to a child with possible injury or death on July 1, 2011. (Pen. Code, § 273a.) Mother was in jail from January 2012 until April 2013.

4

Between July 2011 and June 2013, the plan for I.M. continued to be a planned permanent living arrangement. The juvenile court found adoption was not in I.M.'s best interests because there was no available adult to become the child's guardian. I.M. appeared well cared for by nursing staff and comfortable in an intermediate care facility. All of I.M.'s medical, physical, educational and emotional needs were being met in his placement.

Mother began visiting I.M. again between July and December 2013. During her visits, she was attentive to I.M. and he responded by smiling.

A prospective adoptive family for I.M. was identified in September and October 2013. On December 27, 2013, the juvenile court found it was in the best interest of the child to set a section 366.26 hearing to consider termination of parental rights and adoption.

*B. The Section 388 Petition and the Section 366.26 Report*

On March 4, 2014, mother filed a section 388 petition requesting reunification services with I.M. The petition alleged that mother was released from prison and living in a group home. She was participating in substance abuse classes and other programs. She was certified as a fire crew firefighter and employed at a Jack in the Box. The petition included documentation from mother's counselors and her negative drug test results from April to October 2013.

CFS opposed the petition because of mother's extensive child welfare history with all four of her children, and her criminal conviction for child abuse involving the younger children. CFS found mother's sober living home was unsuitable for I.M. and could not

5

accommodate his medical equipment. Mother could not provide fulltime care, including turning I.M. every two hours. Mother did not provide any negative drug tests after October 2013.

The section 366.26 report recommended the termination of parental rights so that I.M. could be freed for adoption. The prospective adoptive couple was in their early fifties with older children. They lived in a semi-rural area in Northern California in a home that had been used as a special needs nursery. They had previously provided care for medically-fragile children and owned a van with ramps. On March 21, 2014, they visited I.M. and described him as similar to other children they had cared for in their home. They were willing to cooperate in preserving biological relationships with mother and the MGM.

I.M. remained at the Angel View Crippled Children's Home—an intermediate care facility for developmentally disabled children with a nursing component—which was located in the Coachella Valley, near the home of the MGM, who visited him several times a week. I.M. was under the treatment of a neurologist, a gastroenterologist, a dentist, the spasticity clinic, an orthopedic specialist, an occupational therapist, and a physical therapist. He received multiple medications several times a day. He was hospitalized in December 2013 with an upper respiratory infection, pneumonia, high blood pressure, and a urinary tract infection.

C. *The Section 366.26 Hearing*

In June 2014, the juvenile court conducted a combined section 388 and section 366.26 hearing. Mother opposed the termination of parental rights but requested the

6

court grant her reunification services because she was not ready to assume custody of I.M.

Judy Bruno, a mental health worker, testified she provided mother with transportation to visit I.M. Bruno witnessed the interaction between mother and I.M. I.M. responded to mother with smiles and physical signs of being in a good mood. During visits, mother would pick up I.M. and read and sing to him. Mother would also change his diaper and alert the nurse when necessary. Mother had lived in group home where women with children could address parenting and substance abuse issues. Mother was in the third phase of vocational training. At the end of 12 months, mother moved into an affiliated sober living home.

Mother testified that, when she went to jail in 2006, mother lost custody of M.M. and I.M. began to live with the MGM. Mother admitted she was using drugs in 2010 when I.M. was removed from the MGM. Mother had been sober since July 2011. She worked five or six days a week at Jack in the Box and was training to be a shift leader and saving money for her own apartment. During visits with I.M., she would hold him in her lap and he would make "cooing" sounds. She was learning how to feed him with the G-tube. She also helped the nurses bathe him and change his diaper. Although maintaining I.M.'s catheter required two people, home nursing care was available for eight-hour shifts during the week and for two hours of respite care on the weekends. Mother knew I.M. needed his breathing monitor and his oxygen machine. She thought I.M. was receiving good care in his placement until he could live with her. Mother

believed I.M. responded to her and it would be detrimental to him to deprive him of their relationship.

Richard Habben was the primary social worker for I.M. until April 2013. He visited I.M. at Angel View. I.M. appeared to recognize voices and smile. The Angel View staff reported he could also yell and scream. Habben had heard from staff that I.M. responded very well to mother and benefited from her visits. Habben doubted whether mother could turn I.M. every two hours in the middle of night to prevent bed sores. Angel View took excellent care of I.M. but Habben thought, with staff turnover, it would be better for I.M. to be part of a family. Habben was concerned that, if mother received reunification services, the adoption opportunity for I.M. could be lost.

Heidi Wennerberg worked as a special healthcare needs adoption social worker. She requested that parental rights be terminated. In April 2011, I.M. had been registered with the Heart Gallery, an Internet adoption website. The first response was received in September 2013. Nine staff people agreed that I.M. could be adopted. The prospective adoptive parents had 21 year of experience as foster parents of medically-fragile children. After visiting I.M. in March 2014, they reiterated their willingness to adopt him. Once the court terminated parental rights, the prospective adoptive parents would begin additional visits and receive training for several month about I.M.'s care. In June 2014, they asserted they were stilling willing to adopt I.M. when the process was finished.

The juvenile court found that mother's circumstances had changed but denied the section 388 petition as not in I.M.'s best interest to grant mother reunification services rather than placing him in a permanent home.

Mother argued that there was sufficient evidence of a substantial emotional attachment between I.M. and her. She objected to the section 366.26 hearing based on two exceptions to adoption: the beneficial parent-child relationship and the child's placement in a residential treatment facility. (§ 366.26, subd. (c)(1)(B)(i) and (iii).) Mother asked the court to consider concurrent planning services instead of terminating parental rights. Minor's counsel argued that I.M. was adoptable; it was likely that there was a home for I.M.; and it would be more beneficial for him to grow up in a home rather than an institutionalized setting. Mother's relationship with I.M. was not parental but mother could participate in postadoption visits. The juvenile court then found that I.M. was likely to be adopted and the benefit of adoption outweighed the benefit of his relationship with mother. The court terminated parental rights and authorized supervised visits for mother and the MGM.

### III

### DISCUSSION

Respondent contends that mother did not expressly raise in the court below two issues raised on appeal: the argument that I.M. is not adoptable and the argument that he should not be moved from his current placement. However, these issues are closely related and are encompassed within the exception to adoption set forth in section 366.26, subdivision (c)(1)(B)(iii).

Section 366.26, subdivision (c)(1)(B)(iii)—the residential treatment facility exception—only operates when the court has found "by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and

9

order the child placed for adoption. The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." The exception applies when "[t]he child is placed in a residential treatment facility, adoption is unlikely or undesirable, and continuation of parental rights will not prevent finding the child a permanent family placement if the parents cannot resume custody when residential care is no longer needed." In other words, the court first decides whether a child is adoptable, then decides whether adoption is "unlikely or undesirable" and whether parental rights will affect a permanent placement.

A fair reading of the record demonstrates the court considered whether it is likely or desirable that I.M. be adopted and whether continuing parental rights would inhibit a permanent family placement. Although respondent argues mother has waived or forfeited on appeal the issues involving adoptability and the residential treatment facility exception, in the interest of justice and "the protection and welfare of the child," we will consider these issues. (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 527.)

*A. Adoptability*

Adoption is, of course, the preferred plan. A finding of adoptability is reviewed for substantial evidence. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.) In *Carl R.*, a similar case involving a severely disabled child and a single prospective adoptive family, the court said, "the issue before this court is very narrow—what is the proper scope of the inquiry by the juvenile court in determining the adoptability of a child who will require intensive care for life"—in other words, what is "the proper scope of the

10

inquiry the juvenile court must make when the child in question is adoptable only because one family is willing to adopt . . . where the child in question is completely developmentally disabled." (*Id.* at p. 1062.)

The *Carl R.* court continued: "A child who is specifically adoptable and who will need total care for life is at high risk of becoming a legal orphan if parental rights are terminated and the prospective adoptive family is later determined to be unsuitable. [Fn. omitted.] . . . To avoid rendering a total needs child a legal orphan, the assessment of the adoptability of such a child must necessarily include some consideration of whether the prospective adoptive parents can meet that child's needs, since if the prospective adoptive parents cannot meet the child's needs, the child cannot properly be found to be adoptable. The question becomes the extent of the inquiry to be conducted by the juvenile court at the section 366.26 hearing in such a case.

"The statutory scheme requires the Agency to provide the court with a preliminary assessment of the eligibility and commitment of the prospective adoptive parents for the section 366.26 hearing. That assessment includes a social history, screening for criminal records and prior referrals for child abuse or neglect, together with an assessment of the capability of the prospective adoptive parents to meet the child's needs, and whether they understand the legal and financial rights and responsibilities of adoption. (§§ 361.5,

11

subd. (g)(4), 366.21, subd. (i)(4), 366.22, subd. (b)(4).)" (*In re Carl R., supra,* 128 Cal.App.4th at pp. 1062-1063.)[3]

In her appellate brief, mother recites a litany of purported obstacles to I.M. being adopted, relying on a 2010 medical opinion. However, it is contradictory for mother to argue simultaneously that I.M. cannot be placed anywhere except an intermediate care facility and also that he could eventually be placed with her. Instead, the experience and commitment of the prospective adoptive parents constituted substantial evidence of their suitability to adopt I.M. From September 2013 until June 2014, the adoptive parents were unwavering in their desire to adopt I.M. In March 2014, they visited him and confirmed their willingness to proceed and to engage in any necessary training. The prospective parents had significant experience with caring for medically-fragile children. In a CFS meeting, nine professionals—including the "special needs adoption social worker"— who were involved in I.M.'s care conferred and agreed that the prospective family was an appropriate match for I.M. All of these factors supplied substantial evidence of I.M.'s adoptability. (*In re Jeremy S., supra,* 89 Cal.App.4th at pp. 523-526; *In re Helen W.* (2007) 150 Cal.App.4th 71, 74-75, 79-80; see *In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1352.) Because the juvenile court correctly determined I.M. was adoptable by the prospective family, the other issue for us to consider is whether the residential treatment facility exception should operate to prevent the termination of parental rights.

---

[3] The risk of becoming a legal orphan for hard-to-place children has now been alleviated by statute. (*In re I.I.* (2008) 168 Cal.App.4th 857, 871.)

*B. The Residential Treatment Facility Exception*

On appeal, mother relies on the residential treatment facility exception which provides the court shall terminate parental rights unless the court finds a compelling reason that termination would be detrimental to the child because "[t]he child is placed in a residential treatment facility, adoption is unlikely or undesirable, and continuation of parental rights will not prevent finding the child a permanent family placement if the parents cannot resume custody when residential care is no longer needed." (§ 366.26, subd. (c)(1)(B)(iii).)

There is very little authority on this exception. The practice guides find it somewhat puzzling. In *Dependency Quick Guide*, the Administrative Office of the Courts, p. H-184, explains, "This exception is invoked only in relatively rare situations involving children with severe disabilities who are institutionalized. Proceeding by this exception keeps open both the options of return to the parent and permanent placement at a later time," citing *In re Jeremy S., supra,* 89 Cal.App.4th 514 and *In re Ramone R., supra,* 132 Cal.App.4th 1339. In *Seiser & Kumli on California Juvenile Courts Practice and Procedure*, § 2.171[5][b], pp. 2-550-551, the authors comment, "If the child is 'unlikely' to be adopted, the court will never reach the possibility of this exception applying, since the court could not have found it likely the child would be adopted within a reasonable amount of time as required before even considering the exceptions [Welf. & Inst. Code § 366.26(c)]. Further, what the statute means by adoption being 'undesirable' is unclear. This exception is the least utilized exception, if indeed it has ever been utilized." *California Juvenile Dependency Practice* asserts, "Social workers are

13

generally unlikely to recommend the termination of parental rights for children placed in residential treatment facilities, because such children are not currently adoptable." (2 Cal. Juvenile Dependency Practice (Cont.Ed.Bar 2007) § 14.75, p. 1080.)

The only reported case to have analyzed the "residential facility exception" is *In re Jeremy S, supra,* 89 Cal.App.4th at pages 528-529. The court considered the legislative history for the exception: "The Senate Bill No. 1195 task force concluded that when a child is in a residential treatment facility, termination of parental rights generally is not needed to ensure a stable placement for the child. (Sen. Select Com. on Children and Youth, Rep. on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services, *supra*, at p. 11.) It reasoned, moreover, that terminating parental rights might result in leaving a child without any parents if another permanent home cannot be found when he or she is able to leave the residential treatment facility. (*Ibid.*)

"In applying this analysis to our facts, we conclude the exception is inapt. Jeremy was placed in a special needs home primarily because his disabled older brother lives there and the boys share a strong bond. There is no evidence that Jeremy currently requires the professional services available at the home and, as such, is 'able to leave the residential treatment facility' now. Likewise there is no evidence to suggest Jeremy would be 'leaving the home without any parents.' The evidence is quite the contrary. Jeremy has prospective parents who are ready and willing to adopt him. Nothing in the statute or its legislative history suggests the Legislature had any intent to declare those who, by occupation or vocation, choose to operate a residential facility ineligible as adoptive parents. [Fn. omitted.] [¶] [T]he court's action allows Jeremy the freedom to

14

transition from a resident at the special needs facility to a member of a loving family without ever having to make an adjustment to a new physical surrounding." (*In re Jeremy S., supra,* 89 Cal.App.4th at pp. 528-529.)

Based on the foregoing, we reach the following conclusions. Assuming I.M. is placed in a "residential treatment facility"—a term not defined by the statute, the trial court has decided that I.M. is adoptable, a conclusion we affirm. The factors that make I.M. adoptable also mean adoption is likely and desirable. Under these circumstances, an exception for when adoption is unlikely or undesirable does not seem to exist. Furthermore, if mother is ultimately unable to resume custody—which seems to be the most plausible outcome in view of her history and her present circumstances—continuing mother's parental rights would certainly hinder I.M.'s eventual permanent family placement. As was expressly discussed at the section 366.26 hearing, if mother was to engage in reunification services, I.M. would very likely lose the chance of adoption.

Therefore, even if the exception applied, whether the standard of review is substantial evidence or abuse of discretion, the exception should not operate in this case: "It requires little discussion to conclude the court did not abuse its discretion in this case. The benefit of a stable, permanent adoptive home . . . clearly outweighed the benefit of a continued relationship" with mother, whose history and prospects are not favorable; "[t]his is not the extraordinary case where an adoption should have been foreclosed by" an exception provided in section 366.26, subdivision (c)(1). (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351-1352.)

15

IV

DISPOSITION

Substantial evidence supports the trial court's finding that I.M. is adoptable and that no exception applies to the termination of parental rights.  We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>CODRINGTON</u>
J.

We concur:


<u>McKINSTER</u>
Acting P. J.


<u>MILLER</u>
J.

16