Filed 2/16/16  In re Ariana B. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ARIANA B., a Person Coming Under the Juvenile Court Law. | D068720 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ014722) |
| v. | |
| M.B., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed in part, reversed in part, and remanded with directions.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

M.B. appeals the juvenile court's order terminating parental rights over her daughter, Ariana B. M.B. contends the court did not ever inquire into her Indian heritage for purposes of determining whether the Indian Child Welfare Act (ICWA) applies, an error conceded by the San Diego County Health and Human Services Agency (the Agency). Further, she contends substantial evidence did not support the juvenile court's finding at the Welfare and Institutions Code section 366.26[1] hearing that Ariana was likely to be adopted. We agree the court erred in failing to ask M.B. about her Indian heritage, and remand with directions. The court's order finding Ariana adoptable and terminating parental rights is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

When the Agency's petition was filed in late September 2012, five-year-old Ariana was living with her father, Jordan C., and his wife, C.C. The petition alleged Ariana was subjected to excessive discipline and physical abuse by Jordan, and he failed to protect Ariana from physical abuse by C.C. For the most part, Jordan and C.C. admitted the petition's allegations; he had lost his temper and lashed Ariana with a belt, and C.C. had struck Ariana several times on the face after Ariana "wouldn't hurry up to go to the bathroom." Jordan stated Ariana was "very loving" and "so sweet to her baby sister," but also would misbehave at school, "doesn't listen[,] or maybe she just doesn't comprehend." He further informed the Agency that Ariana's stay with them was originally supposed to

---

1      All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

be temporary, and he and C.C. were not prepared to handle Ariana's behaviors. Prior to October 2011, Ariana had resided out-of-state with her biological mother, M.B., who, for various reasons, had sent Ariana to live with her father.

On a form ICWA-010(A), the Agency indicated Ariana had no known Indian ancestry based on an in-person interview with Jordan. Further, Jordan declared on a form ICWA-020 that he has no known Indian ancestry. The Agency's detention report dated October 1, 2012, states that it "has not made contact with the mother to inquire about Native American ancestry." At the time, M.B.'s whereabouts were unknown and she had not been notified of any dependency proceedings. Nevertheless, the court found at the detention hearing that the ICWA "does not apply in this case," and Ariana was detained at Polinsky Children's Center (PCC). The Agency's subsequent jurisdiction/disposition report states under a heading entitled "[ICWA] STATUS": "On 10/01/2012, the Court found that the [ICWA] does not apply." In numerous later reports filed with the court, even after M.B. had been located and interviewed, the same line is repeated by the Agency without amplification.

Within the first few months of 2013, the court had taken jurisdiction under section 300, subdivisions (a) and (b), and placed Ariana back in Jordan's physical custody. The Agency also located M.B., obtained her background, and developed a six-month case plan for her to achieve reunification with Ariana. Throughout her contacts with the Agency, M.B. was generally difficult to reach or unresponsive, evasive with her contact information and whereabouts, and did not appear to have a concrete plan of financially supporting herself. She had moved in and out of several states to live with

3

different people when Ariana had been in her physical custody.  M.B. relocated to California in April 2013, but inconsistently visited Ariana.

In July 2013, the Agency reported that Ariana "presents as a friendly, happy and engaging child."  She possibly suffered from reactive attachment disorder, which may have been caused by frequent changes in her primary caregivers (or persistent disregard for her emotional needs) and affected Ariana's ability to select appropriate attachment figures.  Her physical development was on target, and despite having difficulty staying focused in school, she responded positively to rewards.  It was discovered that her vision was 20/400 and she needed glasses, which may have been one of her issues in school.  A psychologist observed Ariana to be "friendly, energetic and polite," and Ariana possessed average intelligence.  The psychologist believed Ariana met criteria for attention deficit hyperactivity disorder, and with proper treatment, her academic skills would improve.  The Agency reported that Ariana's emotional needs, such as love, unconditional acceptance, encouragement, and emotional safety, were not being met by the adults in her life.  Ariana had experienced frequent moves and multiple caregivers, and she needed stability in order to thrive.  Ariana's father merely felt dutybound to take care of her, and only wished to be a temporary placement.  In addition, M.B. had not shown she could meet Ariana's need for emotional security.  In the summer of 2013, M.B. moved between California, Wisconsin, and Illinois.  By September 2013, Ariana's placement was changed from Jordan to a licensed foster home.

In 2014, both Jordan and M.B. had inconsistent contacts and visits with Ariana.  Jordan did not want to be considered for long-term placement and would be deployed

4

overseas on active military service for three years beginning in May 2015. Throughout much of 2014 and into 2015, M.B. could not be reached or would not contact the Agency. Around November 2014, Ariana was moved to PCC and then to a different foster home.

By late March 2015, the Agency recommended parental rights be terminated and Ariana be adopted. The Agency's analysis, prepared by a qualified social worker who specializes in adoptions, states that Ariana is generally adoptable, and she is a "beautiful, smart and charismatic girl." Ariana's vision had been corrected, and she was in good general health. She was receiving medications for her diagnosed mental health conditions, including posttraumatic stress disorder and depressive disorder. Her foster caregivers of several months reported that Ariana initially struggled to follow a daily routine, but had improved over time. They observed her to be "very caring and insightful," as she wanted to spend her money on toys for disadvantaged children. Ariana was outgrowing her hyperactivity, though still struggled in school with impulse control and concentration. She had improved academic skills with help from tutors, and had received an award for good behavior during the school year. Ariana's continuing mental health and behavioral issues (such as anxiety, lying, and having nightmares) were partially attributed to having been physically and psychologically abused.

A report submitted by Ariana's court-appointed special advocate (CASA) described Ariana as a "cheerful and articulate 8-year-old girl," in "general good health," and she was "doing well" in a structured foster home. The CASA recommended continued therapy for Ariana's mental health issues and tutors to support her academic progress. The CASA also stated that "Ariana seems to have some [negative] behavioral

5

reactions to the calls with [M.B.]," in which her mother would make promises to "get her back."

The Agency requested and was granted permission to include Ariana in adoption recruitment activities to find an adoptive home for her. The Agency's request stated "Ariana is considered a difficult to place child for one or more reasons." Prior to the section 366.26 hearing, the court granted the Agency two continuances so that the Agency could further assess potential adoptive homes for Ariana.

In April 2015, Ariana experienced a "mental health crisis" (suicidal ideations and anxiety) and was hospitalized. The episode occurred after telephone conversations with her mother in which M.B. would say that Ariana was "not good" and if she was "a good girl, [she] could come home." In wanting to harm herself, Ariana said, "I'm bad, I'm ugly, no one will ever want me." After being released from the hospital, Ariana was returned to PCC. The Agency placed Ariana with new foster parents on June 1, 2015, and also located a family in South Carolina that was specifically interested in adopting her.

In late July 2015, the Agency's analysis was that Ariana was "generally and specifically adoptable." Her current caregivers, who had been serving as foster parents since 2012 and had no children of their own, wished to adopt Ariana and had completed a home study. Ariana, in return, wished to be adopted by her current foster parents, who were involving her in a number of extracurricular activities. Further, the family in South Carolina had requested to adopt Ariana, and the adoption placement coordinator for San Diego County reported that there were "nine possible families interested in a child like

6

Ariana."  The Agency was continuing to include Ariana in its recruitment program.  In early August 2015, Ariana's foster parents requested to travel with Ariana to northern California to attend a family wedding, and permission was granted.

The contested section 366.26 hearing was held on August 21, 2015.  The court found by clear and convincing evidence that Ariana was likely to be adopted, and terminated M.B.'s parental rights.  While recognizing Ariana's challenges and previous instability, the court discussed how she had been "remarkably stable" and "secure" with her current caretakers, who wished to adopt her and were approved for it.  There were also a number of other families expressing interest in adopting a child with Ariana's characteristics, causing the court to find she was both generally and specifically adoptable.  M.B. filed a timely appeal.

DISCUSSION

I.     *Inquiry of Mother Regarding Child's Possible Indian Heritage*

Under the ICWA, "where the court knows or has reason to know that an Indian child is involved" in dependency proceedings, the party seeking to terminate parental rights is required to notify the Indian child's tribe.  (25 U.S.C. § 1912(a).)  To implement the ICWA, "[t]he court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child in all dependency proceedings . . . ."  (§ 224.3, subd. (a); *In re A.B.* (2008) 164 Cal.App.4th 832, 838; see Cal. Rules of Court, rule 5.481(a).)  If the court fails to ask a parent about his or her Indian heritage, a limited reversal of an order or judgment and

7

remand for proper inquiry and any required notice may be necessary. (*In re J.N.* (2006) 138 Cal.App.4th 450, 460-462.)

Based on our review of the record and the Agency's concession, inquiry into M.B.'s potential Indian heritage was not completed. The juvenile court's findings that the ICWA did not apply and that Ariana was not an Indian child were based on her father's denial of Indian ancestry at case inception. The Agency's reports then merely repeated the court's October 2012 ICWA findings. It does not appear that M.B. was ever directly asked whether she had any Indian ancestry, and the record does not contain a completed form ICWA-020 for her regarding Indian status.[2] (Cal. Rules of Court, rule 5.481(a)(2) & (a)(3).) Thus, the matter is remanded to the court with directions to ensure ICWA compliance. (See *In re Damian C.* (2009) 178 Cal.App.4th 192, 199 [affirming jurisdictional and dispositional orders, but remanding for ICWA compliance].)

## II. *Adoptability*

M.B. argues there was insufficient evidence to support a finding that Ariana was likely to be adopted. She highlights Ariana's negative behaviors and points to the Agency's ongoing efforts to find a suitable adoptive home for Ariana.

Under section 366.26, subdivision (c)(1), "[i]f the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall

---

[2]    Within the record, Ariana and M.B.'s ethnicities are observed and/or reported as African American. An interstate home study of M.B.'s maternal great-grandmother containing interviews of family members and a discussion of M.B.'s family of origin does not reference any Indian heritage or tribal membership. However, we will not speculate on that point and cannot determine whether M.B. or her family members were ever directly asked pertinent questions.

terminate parental rights and order the child placed for adoption."  The issue of adoptability focuses on the minor—whether her age, physical condition, and emotional state make it difficult to find a person willing to adopt her.  (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523, disapproved on another ground in *In re Zeth S.* (2003) 31 Cal.4th 396.)  Our review is limited to whether the court's finding is supported by substantial evidence.  (*In re Jeremy S.*, *supra*, at p. 523.)

The juvenile court's adoptability finding is supported by substantial evidence.  The Agency's reports present a holistic picture of Ariana, including her developmental and behavioral status at different points in time.  At the section 366.26 hearing, Ariana was a healthy, articulate 8-year-old girl.  Her general character had consistently been described as "loving," "friendly," and "energetic."  Various social workers, doctors, and therapists believed Ariana's mental health and behavioral issues—some of which were caused or exacerbated by her parents' treatment and rejection of her—could be managed and/or improved with appropriate care and treatment.  Indeed, Ariana's most recent mental health breakdown was precipitated by her mother's critical statements and had not reoccurred after the criticism ceased.  Sufficient evidence supports that Ariana had appealing personality traits and her emotional state would stabilize with committed, loving adoptive parents.

Moreover, Ariana's current foster parents wanted to adopt her, and they had involved her in their lives and various extracurricular activities (karate, reading club, swimming, and therapy sessions).  The fact that Ariana had only been in the home for about three months does not detract from its suitability as a prospective adoptive home,

9

since during that period, Ariana experienced stability and having all of her emotional, physical, and daily needs met. In any event, the juvenile court could take the foster parents' expressed interest in adopting Ariana as evidence she was likely to be adopted within a reasonable time. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 79-80; *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649-1650 ["Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor."].) There were multiple other families also interested in adopting a child with Ariana's characteristics. The juvenile court's adoptability finding is supported by substantial evidence.

DISPOSITION

The court's order finding Ariana adoptable and terminating parental rights is affirmed. The matter is remanded to the juvenile court with directions to vacate its finding that ICWA does not apply and to instruct the Agency to complete an ICWA inquiry of M.B. Based on the results of that inquiry (and notice, if appropriate), the court shall proceed accordingly. The court shall advise the parents that if Ariana is determined to be an Indian child under the ICWA, they have the right to petition the court to invalidate any action in violation of 25 United States Code, sections 1911, 1912 and 1913. (25 U.S.C. § 1914.)

O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McINTYRE, J.

11